Becky Ann SMITH, Plaintiff-Appellant,

v.

Arthur GORE, M.D., et al.,
Defendants-Appellees.

Supreme Court of Tennessee,
at Knoxville.

April 13, 1987.

Sidney Gilreath, Donna R. Davis, Gilreath & Associates, Knoxville, for plaintiff-appellant.

Edward G. White, II, Jonathan H. Burnett, Hodges, Doughty & Carson, Knoxville, for Arthur Gore, John David and James Alexander.

Darryl G. Lowe, Lowe & Shirley, Knoxville, for the University of Tennessee Memorial Hosp.

Jack B. Draper, Arnett, Draper & Hagood, Knoxville, for Gynecol, Inc.

## OPINION

DROWOTA, Justice.

Permission to Appeal from a Rule 9, T.R.A.P., interlocutory opinion of the Court of Appeals has been granted in this case to address an issue of first impression in Tennessee. That issue concerns the scope of damages recoverable by a plaintiff in an action for wrongful pregnancy. In its present interlocutory posture, the issue is necessarily limited and the allegations of Plaintiff's Complaint are thus taken as true for the narrow purpose of this appeal. The

Plaintiff in this case is Becky Ann Smith. Defendants are Arthur Gore, Tom Traylor, James Alexander, John David, all medical doctors, the University of Tennessee Memorial Hospital, and Gynecol, Inc., a California corporation doing business in this State and subject to Tennessee longarm jurisdiction.

Plaintiff is 25 years old, divorced (before December, 1982), and has a ninth grade education; she lives in East Tennessee. From 1979 through 1982, she worked at a drive-in restaurant as a waitress and cook, earning less than $5000 a year. Prior to 1982, she had two children; however, on December 9, 1982, she gave birth by caesarean section to twins at the University of Tennessee Memorial Hospital, at which time she also underwent a preplanned tubal ligation for permanent sterilization. The sterilization technique employed is known as a Bleier Secuclip, which is manufactured by Gynecol, Inc. Shortly after the birth of the twins, she resumed working part-time, earning a net income of $60 per week. At about the time she was to return to full-time employment, she was informed on April 9, 1983, that she was pregnant with her fifth child, due in December, 1983. Due to problems with her pregnancy, she was subsequently forced to quit working part-time. On December 20, 1983, Plaintiff gave birth to a healthy, normal baby boy, her fifth child.

The Complaint in this case was filed on December 8, 1983, naming the doctors who had performed the failed tubal ligation, the hospital, and the manufacturer of the Bleier Secuclip as Defendants. In her Complaint, she alleged that the sterilization procedure failed as a result of the negligence of the doctors and hospital; her claim against the manufacturer was predicated on failure to warn and breach of warranties. Recovery was sought for damages of emotional distress, loss of income, medical expenses, and the expenses of rearing the child to majority. Defendants filed their Answers and subsequently filed Motions to Dismiss for failure to state a claim for the recovery of the rearing expenses of a normal, healthy child. In her Amended Com-

plaint, filed September 18, 1984, Plaintiff specifically excluded the costs of prenatal care and of the delivery of the child from the damages but sought punitive damages from two of the Defendants. On March 1, 1985, the trial court held a hearing on the Defendants' Motions to Dismiss. An order denying these Motions was entered on March 21, 1985, but the trial court expressly permitted Defendants to seek a Rule 9, T.R.A.P., appeal on this issue.

The Court of Appeals granted Defendants' Rule 9 Application for an Interlocutory Appeal. Finding that the expenses of raising a healthy and normal child were not recoverable, the Eastern Section reversed the trial court's ruling and held that damages were limited to those immediately related to the pregnancy and birth of the child. The rationale of the Court of Appeals was that the rearing of a normal child is not a legally cognizable injury as a matter of policy and law in Tennessee. Plaintiff then timely applied to this Court for Permission to Appeal, which was granted. We now affirm the Court of Appeals, although on different grounds. The issue in this appeal is limited to the scope of damages that may generally be recovered in an action such as this.

## I. *The Nature of the Action*

Numerous cases have been reported concerning the type of action involved in the case. These cases have been variously denominated "wrongful birth," "wrongful pregnancy or conception," and "wrongful life," but some consensus seems to be emerging that several distinct causes of action are represented by these terms, *see generally* Stein, *Damages and Recovery* (Lawyers Co-Operative 1972), § 221.2, at 256 (Supp.1986):

■ 1. *Wrongful pregnancy or conception* is an action brought by the parents on their own behalf to recover damages resulting from a failed pregnancy avoidance technique (e.g., vasectomy, tubal ligation, abortion, misfilled birth control prescription, etc.); usually the resulting child is healthy. *See, e.g., Miller v. Johnson,* 231 Va. 177, 343 S.E.2d 301 (1986); *Garri-*

*son v. Foy,* 486 N.E.2d 5 (Ind.App.1985); *Nanke v. Napier,* 346 N.W.2d 520 (Iowa 1984); *Weintraub v. Brown,* 98 A.D.2d 339, 470 N.Y.S.2d 634 (1983); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn. 1977).

■ 2. *Wrongful birth* is an action by the parents on their own behalf to recover damages for the birth of an impaired child when the impairment results either from an act or omission of the defendant or because the defendant failed to diagnose or discover a genetic defect (e.g., genetic counselling, failure to perform readily available diagnostic tests, etc.) in the parents or the infant in time to obtain a eugenic abortion or to prevent pregnancy altogether. *See, e.g., James G. v. Caserta,* 332 S.E.2d 872 (W.Va.1985) (Involving two causes of actions); *Harbeson v. Parke-Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983) (*En banc*); *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982); *Stribling v. deQuevedo,* 288 Pa.Super. 436, 432 A.2d 239 (1980); *Howard v. Lecher,* 42 N.Y.2d 109, 397 N.Y.S.2d 363, 366 N.E.2d 64 (1977); *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967).

■ 3. *Wrongful life* is that action brought on behalf of an impaired child to recover damages for having been born with defects due to an act or omission of defendant. *See, e.g., Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982) (*En banc*); *Curlender v. Bio-Science Laboratories,* 106 Cal.App.3d 811, 165 Cal. Rptr. 477 (1980); *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Elliott v. Brown,* 361 So.2d 546 (Ala.1978).

This case is best considered as a wrongful pregnancy action, and as such the opinion is limited to those situations in which the parents are suing to recover damages to their interests; this case does not involve an impaired child and thus we do not address the scope of damages available for the birth of an impaired infant. The damages that may be recovered in this case must of course ultimately depend on the

evidence at trial. We express no opinion as to the outcome of this suit.

## II. *Theories of Recovery*

The cases from other States to which we have been directed by the parties or which we have discovered on our own represent a broad range of resolutions to the issue presented. Fundamentally, three distinct minority positions have developed, but of some thirty jurisdictions that have addressed this question, the majority (21) have limited damages and refused to allow any recovery of rearing expenses for a normal, healthy child. The courts have rationalized their positions on a wide variety of policy grounds. These four theories of recovery are discussed here briefly.

### A. No Recovery of Any Damages

When cases of this kind were first brought in the United States, courts were hesitant to recognize any cause of action at all. An early case, *Christensen v. Thornby*, 192 Minn. 123, 255 N.W. 620 (1934), involved a failed vasectomy. The Minnesota Supreme Court denied any tort recovery, finding that the element of causation presented an insurmountable obstacle to establishing negligence. 255 N.W. at 621–622. Subsequently, in *Shaheen v. Knight*, 6 Lycoming R. 19, 11 Pa.D. & C.2d 41 (1957), another court held that to permit damages for the birth of a healthy child was foreign to the popular sentiment regarding children and the family. 11 Pa.D. & C.2d at 45. Recently, at least one other court has taken the position that the birth of a normal child "is an event which, of itself, is not a legally compensable injurious consequence even if the birth is partially attributable to the negligent conduct of someone purporting to be able to prevent the eventuality of child birth." *Szekeres v. Robinson*, 715 P.2d 1076, 1078 (Nev.1986).

Although apparently refusing to recognize the tort of wrongful pregnancy, the Nevada Supreme Court did distinguish a case involving a healthy child from that of an impaired child. 715 P.2d at 1078 n. 2. Moreover, the Court permitted the case to go to trial on the theory of breach of contract. 715 P.2d at 1079.

The harsh result of the earliest cases has since been renounced in Pennsylvania and Minnesota,[1] and that of the Nevada case was ameliorated to some extent, at least in that case, by permitting a breach of contract claim. So far as we can find, these are the only three cases entirely denying tort recovery at all. Only Nevada has continued to adhere to this absolutist position.[2]

### B. Recovery of Full Damages

States that have permitted recovery of the expenses of rearing a normal child are about as few as those denying any damages. The earliest full recovery case is considered to be *Custodio v. Bauer*, 251 Cal.App.2d 303, 59 Cal.Rptr. 463 (1967). The California Court of Appeals, applying general tort principles and finding that a child could only be considered a foreseeable consequence of a failed sterilization procedure, stated that if a "change in the family status can be measured economically it should be as compensable as the [other] losses." 59 Cal.Rptr. at 476. The law in California on this issue, however, seems to be unsettled; a subsequent California Court of Appeals, in *Stills v. Gratton*, 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1976), while recognizing the rule in *Custodio*, adopted the third minority position, known as the Benefits Rule (*infra*). 127 Cal. Rptr. at 658–659. Apparently, the California Supreme Court has not settled this issue.

The only other State permitting recovery of all damages flowing from the birth of an

---

1. Pennsylvania has adopted the limited damages rule, *see* § II. D, *infra,* and Minnesota, the Benefits Rule, *see* II. C, *infra.*

2. Categorization of Wisconsin into this scheme is somewhat uncertain. So far as is evident, Wisconsin has thus far declined to recognize the right of any recovery in wrongful pregnancy and wrongful life cases, but it has permitted a

case to go to trial on wrongful diagnosis of rubella in a pregnant woman. *See Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975) (Discussion of cases therein). *See also Rieck v. Medical Protective Co.,* 64 Wis.2d 514, 219 N.W.2d 242 (1974); *Slawek v. Stroh,* 62 Wis.2d 295, 215 N.W.2d 9 (1974).

unplanned, healthy child due to a failed avoidance procedure is Ohio. In *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976) (*Per curiam*), twins were involved, one normal and the other impaired. *Bowman* arose when a tubal ligation failed. The Ohio Supreme Court found that such an action was a traditional negligence suit, rather than one for "wrongful life," and was not barred or limited by any considerations of public policy. To the contrary, recognizing that a Constitutional right (not to procreate) is involved, the Court reasoned that to exempt the defendants from liability for the foreseeable consequences of a failed sterilization operation would infringe upon a fundamental right. 356 N.E.2d at 499.

### C. The Benefits Rule

A separate but more substantial minority of courts (in 5 states) have recognized that when a person seeks sterilization for a specific purpose, such as economic inability to support another child or to avoid the birth of potentially defective children, then an uninterrupted chain of causation is established between the failure of the sterilization procedure due to the defendant's negligence and the foreseeable consequence of the conception and birth of a child, and thus

> "it must be recognized that [rearing] costs are a direct financial injury to the parents, no different in immediate effect than the medical expenses resulting from the wrongful conception and birth of the child. Although public sentiment may recognize that to the vast majority of parents the long-term and enduring benefits of parenthood outweigh the economic costs of rearing a healthy child, it would seem myopic to declare today that those benefits exceed the costs as a matter of law."

*Sherlock v. Stillwater Clinic, supra*, 260 N.W.2d 169, 175 (Minn.1977).

Attempting to balance the policy of compensation for the individual tort victim with the broader social values attached to the place of the family in American society, a number of courts have adopted what has become known as the Benefits Rule. The rule is derived from Section 920 of the Restatement Second of Torts:

> "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff which was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."

In *Jones v. Malinowski*, 299 Md. 257, 473 A.2d 429 (1984), the Maryland Supreme Court, finding that traditional tort principles were applicable to a wrongful pregnancy suit, observed that the child has not been injured by having been born healthy, and that "the injury to the parents of a normal child does not reside in the product of the negligent act, i.e. the child itself; damages are not sought on the child's behalf in such cases." 473 A.2d at 435–436. The Court continued, stating:

> "The parents seek damages, not because they do not love and want to keep the unplanned child, but because the direct, foreseeable and natural consequences of the physician's negligence has forced upon them burdens which they sought and had a right to avoid by submitting to sterilization."

473 A.2d at 436. The Court permitted the jury to offset the quantifiable economic costs, which expenses are regularly calculated on established economic factors by actuaries and are fully appreciated by the average citizen's own family experience, against the benefits of family life, taking into account such factors as the reason for the avoidance procedure, the family size, the parents' income, and the age of the parents. 473 A.2d at 437. This approach has been criticized essentially as comparing apples and oranges, that is, involving highly speculative and unquantifiable damages in contrast to intangible benefits. A concisely written dissent by Judge Ferren, advocating the Benefits Rule, in *Flowers v. District of Columbia*, 478 A.2d 1073 (D.C. App.1984), argued that Section 920 of the Restatement has a limited application, requiring not that the intangible benefits of family life be contrasted to the economic

detriments of raising children, but only that economic benefits be weighed against economic detriments. Judge Ferren pointed out that this is how the "special benefit" language of Section 920 is applied in the comments to this Restatement section. 478 A.2d at 1080.

Another court in adopting the Benefits Rule reasoned that "[w]hat must be appreciated is the diversity of purposes and circumstances of the women who use [avoidance techniques]." *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511, 518 (1971). In some cases, the benefits would outweigh any detriment caused by the child's birth, but in others, the situation of the parents would clearly require that when a pregnancy avoidance technique failed, the resulting economic detriment would be compensated under ordinary tort principles. 187 N.W.2d at 513–514. *See also Sherlock v. Stillwater Clinic, supra,* at 174.

The unifying principle that seems to underlie the adoption of the Benefits Rule is the acknowledgement that for some people in certain circumstances at least, to call a child a benefit that outweighs the detriment as a matter of law or policy, is to permit the law to be blinded to the realities of the plaintiff's concrete situation for the sake of indefinite abstractions of public policy. Other cases applying the Benefits Rule include *University of Arizona Health Sciences Center v. Superior Court of Maricopa County,* 136 Ariz. 579, 667 P.2d 1294 (1983) (*En banc*); *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); *Green v. Sudakin,* 81 Mich.App. 545, 265 N.W.2d 411 (1978); *Stills v. Gratton, supra;* and *Coleman v. Garrison,* 281 A.2d 616 (Del. Super.1971).[3]

### D. Recovery of Limited Damages

Of the States that have addressed the question of the extent of damages recoverable in a wrongful pregnancy action, the majority rule (in 21 states) is that a plaintiff may recover the damages immediately and proximately related to the failed avoidance technique and to the pregnancy and

delivery of the child, but no damages may be recovered for the rearing expenses of a normal, healthy child. Allowable damages ordinarily include pain and suffering during the pregnancy and delivery, loss of income, cost of second avoidance procedure (where appropriate), and loss of consortium, as well as mental anguish or emotional distress. Medical expenses are also recoverable. Refusal to permit recovery of child rearing expenses has been based upon various public policy considerations.

One of the most recent limited damages cases is *Macomber v. Dillman,* 505 A.2d 810 (Me.1986). Although accepting the cause of action as an ordinary negligence suit, the Maine Supreme Court held that

"for reasons of public policy ... a parent cannot be said to have been damaged or injured by the birth and rearing of a healthy, normal child. Accordingly, we limit the recovery of damages, where applicable, to the hospital and medical expenses incurred for the sterilization procedures and pregnancy, the pain and suffering connected with the pregnancy and the loss of earnings by the mother during that time."

505 A.2d at 813. The Court also permitted loss of consortium to be recovered by the plaintiff's husband. A partial dissent argued that the majority was departing from ordinary tort principles regarding foreseeability and was rationalizing the result on an unjustifiable judicial assertion of indefinite public policy. *Id.,* at 814.

The Supreme Court of Kansas similarly held that while the "birth of a normal, healthy child may be one of the consequences of a negligently performed sterilization ... it is not a legal wrong for which damages should or may be awarded." *Byrd v. Wesley Medical Center,* 237 Kan. 215, 699 P.2d 459, 468 (1985). The Kansas Court permitted recovery of the other consequential damages flowing from the failed avoidance procedure. A number of other courts have held that as a matter of public policy the birth of a healthy child is not a legal injury for which damages may be

---

**3.** The Delaware Supreme Court subsequently rejected the Benefits Rule and disallowed any

rearing costs as a matter of law. *Coleman v. Garrison,* 349 A.2d 8 (Del.1975).

awarded. *See Miller v. Johnson, supra; O'Toole v. Greenburg,* 64 N.Y.2d 427, 488 N.Y.S.2d 143, 477 N.E.2d 445 (1985); *James G. v. Caserta, supra; Fassoulas v. Ramey,* 450 So.2d 822 (Fla.1984) (*Per curiam*); *Fulton-DeKalb Hosp. Auth. v. Graves,* 252 Ga. 441, 314 S.E.2d 653 (1984); *Nanke v. Napier, supra; McKernan v. Aasheim,* 102 Wash.2d 411, 687 P.2d 850 (1984); *Flowers v. District of Columbia, supra; Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385 (1983); *Schork v. Huber,* 648 S.W.2d 861 (Ky.1983); *Weintraub v. Brown, supra; Boone v. Mullendore,* 416 So.2d 718 (Ala. 1982); *Wilbur v. Kerr,* 275 Ark. 239, 628 S.W.2d 568 (1982); *Maggard v. McKelvey,* 627 S.W.2d 44 (Ky.1981); *Kingsbury v. Smith,* 122 N.H. 237, 442 A.2d 1003 (1982); *Mason v. Western Pennsylvania Hospital,* 499 Pa. 484, 453 A.2d 974 (Pa.1982); *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982); *Hickman v. Myers,* 632 S.W.2d 869 (Tex.App.1982); *P. v. Portadin,* 179 N.J.Super. 465, 432 A.2d 556 (1981); *Public Health Trust v. Brown,* 388 So.2d 1084 (Fla.Dist.App.1980); *Sorkin v. Lee,* 78 A.D.2d 180, 434 N.Y.S.2d 300 (1980); *Wilczynski v. Goodman,* 73 Ill.App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979); *Sala v. Tomlinson,* 73 A.D.2d 724, 422 N.Y.S.2d 506 (1979); *Bushman v. Burns Clinic Medical Center,* 83 Mich.App. 453, 268 N.W.2d 683 (1978);[4] *Coleman v. Garrison, supra; Terrell v. Garcia,* 496 S.W.2d 124 (Tex.Civ.App.1973).

Generally, although the policy rationales of these cases vary in reaching the conclusion that the birth of a healthy child is not a legally cognizable injury, the operating theory adopted by these courts seems to be that the injury (the pregnancy and birth) that results is to the parents' interests and does not extend to the child, who is healthy and uninjured. Rather, liability is limited to the injuries to the parents because only their interests have been damaged by defendant's negligence. Consequently, these courts, with few exceptions, accept the distinction between cases involving impaired children and those involving healthy children to justify some limitation on liability. In *Betancourt v. Gaylor,* 136 N.J.Super. 69, 344 A.2d 336 (1975), the Court concluded that damages for wrongful pregnancy were limited by "the scope of the injury to the expenses attending the unexpected pregnancy of a woman." 344 A.2d at 340. Limiting liability to the injuries to the parents' interests not only places a manageable boundary on the defendant's exposure but also provides the plaintiff with some remedy for a clearly actionable tort that cannot be distinguished from any other recognized tort.

### III. *Limitation of Liability in Tennessee*

This case involves an ordinary tort action. The Defendants' duty to Plaintiff in performing a tubal ligation is indistinguishable from any other duty owed to a patient during medical treatment. That Plaintiff has suffered a foreseeable consequence she most certainly sought to avoid is clear. Moreover, we are generally unpersuaded by the approaches taken in most of the limited damages cases from other States. The public policies on which these decisions rest tend to conflict and do not seem to have a foundation in any express public policy. Rather than ground our decision on abstract notions of public policy, we rest our holding limiting Defendants' liability in this case on two grounds: (1) that the State of Tennessee imposes by statute the responsibility for the support of children upon the parents, thereby relieving Defendants of the liability for the support of Plaintiff's healthy child, and (2) considering not only the extensive statutory law regarding the obligation to support, but in light of both the common law obligation to support and this Court's restricted role in declaring public policy, shifting the common law and statutory obligation from the parents to defendant in such cases as these must be left to legislative action.

### A.

We have considered the numerous limited damages cases from other States. The

---

**4.** The law in Michigan is evidently unsettled. *Stephens v. Spiwak,* 61 Mich.App. 647, 233 N.W.2d 124, 127 (1975), reaffirmed the Benefits Rule adopted in *Troppi v. Scarf, supra.*

policy grounds on which denial of recovery for rearing expenses is founded are more in the nature of philosophical assertions than legal reasons for the results reached. Some of these courts rely on "the simple proposition that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child." *Byrd v. Wesley Medical Center, supra,* 699 P.2d at 463 (citation omitted). *See also, e.g., Macomber v. Dillman, supra,* at 813; *O'Toole v. Greenburg, supra,* 488 N.Y.S.2d at 146, 477 N.E.2d at 448; *Fulton-DeKalb Hosp. Auth. v. Graves, supra,* 314 S.E.2d at 655–656; *Nanke v. Napier, supra,* at 522–523; *Weintraub v. Brown, supra,* 470 N.Y.S.2d at 641; *Schork v. Huber, supra,* at 862; *Mason v. Western Pennsylvania Hosp., supra,* 453 A.2d at 976; *Public Health Trust v. Brown, supra,* at 1085; *Coleman v. Garrison, supra,* at 13. Other courts have stated the policy that the benefits of a healthy child outweigh the damages suffered as a matter of law. *See, e.g., Fassoulas v. Ramey, supra,* at 824; *Beardsley v. Wierdsma, supra,* at 293; *Hickman v. Myers, supra,* at 870–871; *Terrell v. Garcia, supra,* at 128. One court has found express legislative policy regarding the stability of the family to support its decision to foreclose liability for support. *See Flowers v. District of Columbia, supra,* at 1077–1078. In several cases, the courts reasoned that assessment of the detriments of rearing a child would be highly speculative and uncertain or would permit imposition of liability disproportionate to the defendant's culpability. *See, e.g., Miller v. Johnson, supra,* 343 S.E.2d at 307; *James G. v. Caserta, supra,* at 878; *Sorkin v. Lee, supra,* 434 N.Y.S.2d at 303. *Cf. Rieck v. Medical Protective Co., supra,* 219 N.W.2d at 244–245. A few courts have found that recognition of such damages required legislative action. *See, e.g., Wilczynski v. Goodman, supra,* 29 Ill.Dec. at 224, 391 N.E.2d at 487; *Becker v. Schwartz, supra,* 413 N.Y.S.2d at 901, 386 N.E.2d at 812. A number of courts combined several of these grounds to reach the conclusion that damages should be limited. Additional policy reasons have included protection of the family unit and prevention of a windfall recovery by the plaintiff.

In many of these cases, strong dissents were filed. These dissents often advocated a more compassionate examination of the realities of the plaintiff's circumstances and urged the majorities to recognize that for many people having additional children would stretch financial resources to the limits, relegating these plaintiffs to a life of dependence and poverty and imposing upon their children a deprived and disadvantaged childhood. These dissents generally favored adoption of the Benefits Rule, analyzing the issue with traditional tort liability principles. Some dissents that would deny any recovery argued that causation had not been established. A few dissents took the position that no damages could be awarded absent legislative authorization.

In many of these cases, most of the policy reasons cited by the courts were not clearly based on any definite authority or taken from any particular source. Many of the observations made by these courts were essentially philosophical discourses on the value of life without clear constitutional, legislative, or common law foundation.

### B.

The law in Tennessee restricts this Court's role in declaring public policy. The Court is not free to establish what its members believe to be the best policy for the State; rather, we must determine where public policy is to be found, what the specific public policy is, and how it is applicable to the case at hand. Ordinarily, the Court is not the institution that is called upon to divine the nature of public policy in its most general terms; this Court usually decides whether or not any controlling public policy has been established or declared and then determines how it applies to a particular case.

While the case law does define public policy in its broadest terms, this concept does not of itself provide the specific guidance to resolve the kind of issue presented by a case of this nature. Nevertheless, "[p]ublic policy is the present concept of

public welfare or general good. *State ex rel. Loser v. National Optical Stores*, 189 Tenn. 433, 225 S.W.2d 263 (1949); *Ford Motor Company v. Pace*, 206 Tenn. 559, 335 S.W.2d 360 (1960)." *Lazenby v. Universal Underwriters Ins. Co.*, 214 Tenn. 639, 648, 383 S.W.2d 1, 5 (1964).

▆▆▆ The public policy of Tennessee "is to be found in its constitution, statutes, judicial decisions and applicable rules of common law. *Home Beneficial Assn. v. White*, 180 Tenn. 585, 177 S.W.2d 545 (1944)." *State ex rel. Swann v. Pack*, 527 S.W.2d 99, 112 n. 17 (Tenn.1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). *See also Lazenby v. Universal Underwriters Ins. Co., supra*, 214 Tenn. at 648, 383 S.W.2d at 5. In *Home Beneficial Association v. White, supra*, this Court recognized that " '[t]he meaning of the phrase "public policy" is vague and variable; courts have not defined it, and there is no fixed rule' " upon which it may be readily discerned. 180 Tenn. at 589, 177 S.W.2d at 546 (citation omitted). Moreover,

" 'only in the absence of any declaration in [the Constitution and statutes] may [public policy] be determined from judicial decisions.... All questions of policy are for the determination of the legislature, and not for the courts.... Where courts intrude into their decrees their opinion on questions of public policy, they in effect constitute the judicial tribunals as lawmaking bodies in usurpation of the powers of the legislature.' "

*Cavender v. Hewitt*, 145 Tenn. 471, 475–476, 239 S.W. 767, 768 (1921) (citation omitted). *See also Baptist Memorial Hosp. v. Couillens*, 176 Tenn. 300, 311–312, 140 S.W.2d 1088, 1093 (1940).

▆▆▆ For the Court to find that no public policy prevents the continuing development of the common law is wholly different from positively declaring the public policy of the State. *Cf. Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn.1987); *Davis v. Davis*, 657 S.W.2d 753 (Tenn.1983); *Luna v. Clayton*, 655 S.W.2d 893 (Tenn.1983). This observation is especially pertinent to any case in which the Court must determine which of several competing public policies represents the most compelling and controlling public policy for this State. The Court simply does not function as a forum for resolution of such generalized public issues; rather, it must decide the legal case or controversy presented by the particular parties before it.

The diversity of rationales adopted by courts in other States concerning this issue is of itself convincing evidence that the policies involved tend to conflict, as many reasonable people have disagreed over the proper outcome of these cases. Not only have these courts divided sharply over the recognition of this type of action, but the courts that provide various degrees of recovery cannot agree about the reasons for the results they reach. Many well-reasoned dissents have been filed. These conflicts in public policy cannot easily be reconciled in a judicial setting. As the Supreme Court of Arkansas aptly observed, "[i]n sifting through these decisions and studying the words and thoughts of judges and writers, it is understandable why courts have reached different results. It is a question that searches the nature and validity of our civil law system which allows money damages to compensate for wrongs that are intangible...." *Wilbur v. Kerr, supra*, 628 S.W.2d at 571. Furthermore, Justice Dudley of that Court in his dissent in that case expressed similar reservations concerning the judicial use of indefinite sentiments of public policy to justify the results in these cases, stating that "[f]or some time I have been disquieted by the lack of a standard by which we determine when to apply public policy and the lack of a meaningful definition by which we discover what constitutes public policy." 628 S.W.2d at 572. This dissent then went on to comment on the competing policies entailed in this case, stating that "[w]hile ... I find many good policy reasons to support the view of the majority, I find an equal number of policy reasons against that view. Therefore, I would not invoke the doctrine; instead, I would follow the common law." *Id.*

The competing public policies involved in this case include constitutional values concerning the rights of persons to control the size of their families. Such rights can only be considered legal interests which State tort law will protect from invasion. If, however, full recovery were allowed in this kind of case, the potentially adverse effect on health care providers of pregnancy avoidance techniques could inhibit the availability of these avoidance techniques to other persons who have decided to exercise their constitutional rights to control the size of their families. Nevertheless, some deterrent is required to assure that due care will be exercised by providers of avoidance techniques, which deterrence is one of the operative policies of tort law. Compensation for an injury to a legally protected interest is another tort policy involved. Moreover, the State not only has an interest in providing adequate tort remedies, but the State also places great value on life and has an interest in promoting stable, self-supporting families. Other State policies impose the obligations and responsibilities of family life on the parents of minor children, but the State has also provided a network of social programs designed to assist people in fulfilling these responsibilities. That some remedy should be provided to Plaintiff in this case is clear, but the extent of that remedy is problematic. In *Kingsbury v. Smith, supra,* the New Hampshire Supreme Court pointed out in this regard:

> "Throughout its course, the common law has recognized that life on this planet is not free from all risks and, in this recognition, has endeavored to provide rational remedies to those persons whose lot in life has taken a detrimental turn as the result of the conduct of others who have breached a duty owed to the injured party. In many situations, the outlines of the duty are more apparent than the remedy which society chooses to provide."

442 A.2d at 1004.

In this case, we are not only constrained by our restricted role in declaring public policy but also by the uncertainty as to the direction that competing public policies would lead. We are required to attempt to find the applicable public policy of the State in our Constitution, statutes and common law. In short, this Court will not engage in the metaphysical enterprise into which many other courts seem to have been drawn by the issue presented in this case. As one court noted:

> "Contraception, conjugal relations, and child birth are highly charged subjects. It is all the more important, then, to emphasize that the resolution of the case before us requires no intrusion into the domain of moral philosophy. At issue here is simply the extent to which defendant is civilly liable for the consequences of his negligence."

*Troppi v. Scarf, supra,* 187 N.W.2d at 513.

### C.

Although no Constitutional provision or statute directly controls the issue, the common law of torts does provide some guidance. As observed previously, many states faced with this question of the extent of recoverable damages have held that as a matter of law the birth of a normal child is not a cognizable legal injury. The maxim representing this precept of the law is *damnum absque injuria,* or as stated in *Stratton v. Conway,* 201 Tenn. 582, 301 S.W.2d 332 (1957), that is, " '[l]iterally, "A loss without an injury." It is a phrase used to describe a loss arising from acts or conditions which do not create a ground of legal redress.' " 201 Tenn. at 585–586, 301 S.W.2d at 333 (citation omitted).

Reliance on this precept is, however, misplaced when the interest of the plaintiff is so clearly protected by the law, as is the situation in this case. In *Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W.2d 270 (1966), this Court was presented with another issue involving a previously unrecognized injury and there found that "the common law phrase, 'an invasion of a legal right the law will redress,' rings in our ears. The ring of another common law principle sounds in our ears simultaneously, 'damnum absque injuria'; the two sounds are disharmonious." 217 Tenn. at 475, 398 S.W.2d at 273. In the instant

case, Plaintiff's Complaint sufficiently alleges a recognized tort. The only question is the extent of damages that may be recovered for the injury. To hold that no injury is recognized would be contrary to established tort law. Nevertheless,

> "[t]he law of damages aims at compensation for the actual loss sustained, but within these limits: In tort liability arises in invitum, by force of law; and the extent of liability is fixed by law independently of the wrongdoer's consent. The law holds him liable not for all the harm that follows his wrong, not for all its consequences, but only for its proximate consequences."

*Black v. Love & Amos Coal Co.*, 30 Tenn. App. 377, 383, 206 S.W.2d 432, 434 (1947). Consequently,

> " '[t]he question whether damage in a given case is proximate or remote is one of great importance. It is a question of substantive law, and the determination of it determines [a] legal right. It is unfortunate that no definite principle can be laid down by which to determine this question. It is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent.' "

*Lancaster v. Montesi*, 216 Tenn. 50, 56, 390 S.W.2d 217, 220 (1965) (citation omitted). The question then becomes whether the legal cause of Plaintiff's injury (i.e., the necessity to support her fifth child) can be considered to be the acts or omissions of Defendants. The Restatement Second of Torts, § 917, states that "[o]ne who tortiously harms the person or property of another is subject to liability for damages for the consequences of the harm in accordance with the rules on whether the conduct is the legal cause of the consequences." Comment c to Section 917 explains that "[t]he rule stated in this Section does not apply to the creation of liability but only to its extent."

■ To say that the failure of the sterilization technique employed by Defendants in this case did not cause the birth of Plaintiff's child (and thus the necessity to support him) would, obviously, defy scientific logic, but the law does not live by logic alone. Scientific or philosophical causation cannot be confused with the technical concept of legal causation. Legal causation involves several factors not a part of the cause-and-effect logic of scientific inquiry, which is itself only one of the factors (i.e., cause-in-fact) involved in determining legal causation. As Prosser stated:

> " 'Proximate cause'—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of his conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond.... But any attempt to impose responsibility upon such a basis would result in indefinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' ... Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy."

*Torts* (4th ed. 1971), § 41, at 236–237. *Cf.* Restatement Second of Torts, § 431, comment a.

■ As Prosser further observed, the determination of the extent of liability and of legal causation inescapably involves notions of public policy. *Torts* (4th ed. 1971), § 3, at 14–15; § 42, at 244. The relationship of legal causation to the extent of damages must be analyzed carefully in this case. The Restatement Second of Torts, § 431, states:

> "The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, *and* (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." (Emphasis added.)

Thus, if some definable policy relieves Defendants of the responsibility for the otherwise foreseeable consequences of the failed pregnancy avoidance technique, then they cannot be held liable for the rearing expenses of Plaintiff's healthy child. McCor-

mick, recognizing that legal causation limits liability in some instances, wrote of the "problems of defining the boundaries of legal liability," stating:

"As such, they should be discussed in terms, not of abstract empty categories of causative and intervening forces, but in terms of the nature of the interest of the plaintiff, the extent of protection which on grounds of policy and justice ought to be afforded, and whether the particular harm inflicted is within the ambit of that protection."

*Damages* (West 1935), § 75, at 268.

### D.

■■■ At common law, the obligation to support minor children lies with the parents. *See* Clark, *Law of Domestic Relations* (West 1968), §§ 6.2–6.3, at 187–192. This obligation is also imposed by statute in Tennessee. *See* T.C.A. § 34–1–101. Not long after a predecessor of this present code section had been enacted, this Court decided *Brooks v. Brooks*, 166 Tenn. 255, 61 S.W.2d 654 (1933), and stated:

"The obligation previously resting upon the father [at common law] to maintain and support his minor children cannot be said to have been destroyed by this statute. That obligation was to provide for the child 'in a manner commensurate with his means and station in life.' ... The obligation cast upon the mother by the statute must be measured by the same varying and relative standard."

166 Tenn. at 257, 61 S.W.2d at 654 (citation omitted).

The social problem of the support of minor children following divorce or of the support of minor children born out of wedlock has been the subject of numerous statutory enactments in this State. T.C.A. § 36–2–102 establishes the liability of the father to provide support for a child born out of wedlock. *See also Brown v. Thomas*, 221 Tenn. 319, 426 S.W.2d 496 (1968). A petition may be filed to establish paternity and to compel the father to support the child. T.C.A. §§ 36–2–103 (Supp.1986); 36–2–108 (Supp.1986). A petition for legitimation may be filed and an order of support may be entered as part of the decree in such cases. T.C.A. §§ 36–2–202, 36–2–203 (Supp.1986). Legitimation may be accomplished by the subsequent marriage of the parents. T.C.A. § 36–2–207.

Upon the dissolution of marriage, the court may enter a decree controlling the support of the minor children. T.C.A. §§ 36–5–101 *et seq.* Failure to comply with a support order is punishable as contempt. T.C.A. § 36–5–104. In addition, this State has adopted the Uniform Reciprocal Enforcement of Support Act, T.C.A. §§ 36–5–201, *et seq.* T.C.A. § 36–5–212 provides that any person with legal custody of a child may bring a petition to obtain support for that child and, under T.C.A. § 36–5–306, the Department of Human Services may enforce the duty of support. Other statutory provisions impose and vindicate the obligation to support as well. *See, e.g.,* T.C.A. §§ 36–5–405; 36–5–501; 36–6–101, *et seq.*

When a person has custody of a minor dependent child and has no sufficient source of support for that child, the State undertakes the support of such children through Aid to Families with Dependent Children. T.C.A. §§ 14–8–101, *et seq.* A civil action may be brought by Human Services to recover the assistance paid by the State from the person failing to support a child. T.C.A. § 14–8–123. A person accepting Aid to Families with Dependent Children assigns support rights to the State for enforcement. T.C.A. § 14–8–124. *See also* T.C.A. § 36–5–108. The Department of Human Services maintains a registry of putative fathers. T.C.A. § 36–2–209 (Supp.1986). Moreover, while garnishment of an employee's wages is generally prohibited under T.C.A. § 50–2–105 (Supp.1986), an express exception is provided for enforcement of child support obligations.

■■■ Although Plaintiff has alleged an ordinary common law tort and, if successful, may recover damages for the foreseeable consequences of the tortious injury, as Section 431 of the Restatement Second of Torts provides, the manner in which the harm (i.e., the birth of a normal child who must be supported until at least the age of

majority) resulted limits Defendants' liability for the support of this child because legislative enactment of such comprehensive statutory schemes controlling child custody and support demonstrates that the public policy of Tennessee is that the obligation for support of minor children is affirmatively placed on the parents of the children. The fact that a normal child is the result of a failed pregnancy avoidance technique will not shift this responsibility from the parents to the defendant in such a case. Application of general common law principles of tort recovery is not appropriate in this case because both the common law itself and statutory law have specifically established responsibility for the support of children. If this responsibility is to be shifted away from the parents, such a determination is for the Legislature and not the Judiciary. Significant and far-reaching questions of social policy are involved, "and it is the prerogative of the General Assembly to declare the policy of the State touching the general welfare." *Baptist Memorial Hospital v. Couillens, supra,* 176 Tenn. at 311–312, 140 S.W.2d at 1093.

We conclude that in a wrongful pregnancy action the law relieves these Defendants of liability for the otherwise foreseeable consequences of the failed pregnancy avoidance technique to the extent that the obligation to support minor children clearly rests upon the parents. The responsibility for support of Plaintiff's fifth child rests with Plaintiff and the father of this child. The laws of the State will assist Plaintiff in assuming this responsibility. In view of the nature of the injury to Plaintiff and the numerous, complex and competing social policies involved, the firmly established common law and statutory obligation of parents to support their children is not shifted as a result of the tort of wrongful pregnancy. Defendants' negligence cannot be considered the legal or proximate cause of the damages incurred by Plaintiff for the support of her normal, healthy child in the circumstances of this case. The extent of recovery is thus limited to those damages immediately flowing from the failed pregnancy avoidance technique.

### E.

The exact extent of recoverable damages must be delineated. The cases involving limited damages have generally permitted recovery of all medical expenses, both for the failed avoidance procedure and for the pregnancy and delivery. These expenses would also include a period of postnatal recovery for the mother. Any damages directly related to the pregnancy and delivery would be recoverable, such as the costs of prenatal care during pregnancy, the expenses of any medical complications arising from the avoidance technique itself or caused by the pregnancy and delivery, as well as pain and suffering from the time Plaintiff discovered she was pregnant until she has recovered from childbirth. In addition, lost wages during pregnancy, delivery, and some period of postnatal recovery of the mother are recoverable. In the appropriate case, loss of consortium would be an element of damages as well.

Plaintiff has sought damages for emotional distress in this case. Tennessee has recognized the tort of negligent infliction of emotional distress. *See Laxton v. Orkin Exterminating Co., Inc.,* 639 S.W.2d 431, 434 (Tenn.1982). Recovery of damages for emotional distress or mental anguish is generally limited to a definite period. 639 S.W.2d at 434. This period extends from the discovery of the pregnancy until its termination. In assessing these damages, the jury may consider the reason for which Plaintiff underwent the pregnancy avoidance technique. Other considerations may include the age of the parent or parents, marital status, the number of other children for whom the parent or parents are already responsible, and the economic condition of the parent or parents. The degree of distress could be amplified by a combination of these factors.

In regard to the extent of damages, a number of courts have discussed the reasonableness of the alternatives to rearing, i.e., abortion or adoption, as part of the duty to mitigate damages. Generally, courts seem to have rejected consideration of these alternatives as part of the

duty to mitigate. We think that not only would imposing these choices upon a plaintiff impermissibly infringe upon Constitutional rights to privacy in these matters, but the nature of these alternatives are so extreme as to be unreasonable, especially when the recoverable damages do not include the expenses of rearing the child. We observe, however, that where a plaintiff exercises her Constitutional right to terminate the pregnancy, recovery of the cost of the abortion, in lieu of that of the delivery, is a proper element of damages. Moreover, in considering damages for emotional distress, some cases may justify consideration of the plaintiff's struggle to decide whether to rear, place for adoption, or terminate the pregnancy.

## IV. *Conclusion*

In a wrongful pregnancy suit, the interests protected are those of the parents. Legal causation does not extend to the consequence of the necessity of support. The extent of recoverable damages is limited by this State's law and policy, which impose the obligation to support minor children on the parents. This does not, however, and cannot relieve the defendant in these cases of all liability for the injuries caused by his negligence; it only establishes a boundary on the extent of recoverable damages.

In reaching this result, we have not relied on abstract and indefinite notions of public policy and have attempted to define the limits of liability imposed by the law. Tort causation is not philosophical causation. This Court will not accept the invitation extended by the nature of this case to attempt to resolve existential questions concerning the value of life. This Court functions to discern not general but specific public policies and then applies these policies as they are embodied in the Constitution, statutes, and common law of this State. If liability is to be extended by shifting the obligation to support from the parents to defendants in wrongful pregnancy actions, the Legislature is the proper forum in which the competing social policies should be considered in changing the law.

We are aware of the hardship of the result and are not blind to the economic realities that accompany the raising of children. Nevertheless, this is not a case involving a natural evolution of the common law due to changed social conditions. *See Powell v. Hartford Accident and Indemnity Co.*, 217 Tenn. 503, 513, 398 S.W.2d 727, 732 (1966). The subject is extensively covered by numerous statutory provisions concerning child support obligations, leaving little doubt concerning the public policy of this State. The common law itself imposes this obligation on the parents. Plaintiff has a remedy for the tort, but recovery is limited to the injuries suffered by her and proximately caused by Defendants. We do not express any opinion controlling the outcome of this case. Parenthetically, Plaintiff's claim for punitive damages may be asserted in the same manner as in any ordinary tort action and we see no reason to address this now as part of the issue concerning the extent of compensatory damages.

Accordingly, we affirm the judgment of the Court of Appeals and remand the case to the trial court for further proceedings not inconsistent with this opinion. The costs of this appeal are to be apportioned equally among the parties.

BROCK, C.J., FONES and HARBISON, JJ., and LADD, Special Judge, concur.