IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 5, 2013 Session


**KENNETH E. KING v. ANDERSON COUNTY, TENNESSEE**


**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Anderson County**
**No. B0LA0397      Donald Ray Elledge, Judge**

---

**No. E2012-00386-SC-R11-CV - Filed November 21, 2013**

---


GARY R. WADE, C.J., dissenting.

   I respectfully dissent.

## I. Facts

   On October 27, 2009, Charles Faircloth, a deputy with the Anderson County Sheriff's Department, stopped a car driven by Kenneth King (the "Plaintiff") for driving his vehicle into the path of the deputy's car and for failing to operate his vehicle's headlights while it was raining. During a routine check of the Plaintiff's driver's license, Deputy Faircloth received erroneous information that the Plaintiff's license had been suspended. Deputy Faircloth then notified the Plaintiff that he was under arrest and would be taken into custody. In response, the Plaintiff insisted that there must be "some mistake" and asked Deputy Faircloth to verify the information. He also asked permission to telephone a family member to notify his children of his circumstances. The deputy refused to allow a call. At that point, the Plaintiff argued with Deputy Faircloth and cursed at him. When the Plaintiff was booked into the Anderson County Detention Facility for driving on a suspended license, officers labeled him as "medium security" based upon his resistance to the arrest process and his uncooperative behavior. The Plaintiff was assigned to cell 306G, which contained six other inmates, four of whom were charged with violent crimes: Cody Brown, charged with domestic assault and false imprisonment; Gary Russell, charged with aggravated robbery and aggravated assault; Bradford Pate, charged with murder, aggravated burglary, aggravated robbery, and aggravated kidnapping; and Brandon Paul, charged with attempted second degree murder. The Plaintiff remained in the cell throughout the night, apparently without incident.

On the following morning, the Plaintiff was transported by officers to General Sessions Court for a hearing. At about 11:00 a.m., when it was discovered that the Plaintiff had a proper license, the judge ordered the Plaintiff to be released. The Plaintiff was then returned to the detention facility to await the arrival of Officer Terri McCloud, who had the responsibility of processing his release. When Officer McCloud had not arrived after more than three hours, the Plaintiff was returned to the same cell he had occupied the previous night. Although Officer McCloud had no other release responsibilities during the delay, the evidence in the record does not otherwise indicate why the Plaintiff was returned to the cell rather than being released as ordered by the judge.[1]

Within an hour after his return to the cell, the Plaintiff was assaulted by Mr. Paul. Although what provoked the altercation is unclear from the record, there was evidence that the Plaintiff claimed that he had access to drugs and had cursed one of his cellmates. The Plaintiff's injuries, which were described as serious, included a broken nose and a broken orbital bone. The Plaintiff had also reported to the detention facility's nurse that his cellmates, in a futile search for drugs, had fondled his testicles and digitally penetrated his rectum.

Afterward, the Plaintiff filed suit against Anderson County, claiming that it had been negligent in three ways: (1) by classifying him as a medium security inmate; (2) by failing to properly supervise the inmates in his cell; and (3) by failing to release him in a timely manner.

Following a bench trial, the trial court rejected the Plaintiff's claims that Anderson County was negligent in either classification or supervision, but ruled that Anderson County was, in fact, negligent by unreasonably delaying the release of the Plaintiff. The court awarded the Plaintiff $170,000 in damages and apportioned fifty-five percent of the fault to Anderson County while attributing forty-five percent of the fault to the Plaintiff. The judgment, therefore, amounted to $93,500. The trial court also ordered Anderson County to pay the Plaintiff's medical bills, which totaled $42,317.34.

The Court of Appeals affirmed, concluding that the injury was reasonably foreseeable because the Plaintiff, after the clerical mistake affecting his license was revealed and the judge ordered him released, was not timely released, and was returned to the same cell as inmates charged with violent crimes, thereby creating a foreseeable potential for harm. King v. Anderson Cnty., No. E2012-00386-COA-R3-CV, 2012 WL 5960838, at *5 (Tenn. Ct. App. Nov. 29, 2012). The Court of Appeals further concluded that the evidence did not preponderate against the trial court's finding that Anderson County was fifty-five percent at

---

[1] Neither Deputy Faircloth nor Officer McCloud appeared as a witness for Anderson County.

fault for the incident.  Id.


## II. Analysis

Initially, in order to demonstrate a prima facie claim of negligence, basically defined as injuring another through failure to exercise reasonable care, a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009) (quoting McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)).

The majority has, in my view, properly determined that Anderson County owed a duty of care, that by failing to timely release the Plaintiff from custody the conduct of Anderson County officers fell below the applicable standard, that the Plaintiff suffered injuries, and that the deviation from the standard of care was the cause in fact of the injuries.  Where I part ways with the majority is the application of the fifth element of the Plaintiff's negligence claim—proximate cause.

Proximate cause is established by a three-prong test:

(1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have been foreseen or anticipated by a person of ordinary intelligence and prudence.

McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn. 1991).

I agree with the majority's conclusion that the first prong was established.  I cannot agree, however, that public policy considerations should limit liability in this circumstance and that Anderson County officials had no reason to foresee or anticipate the prospect of violence—the remaining two prongs in the analysis.  For Anderson County to prevail on the second prong, the court must determine that there is an express public policy ground that prevents liability for "otherwise foreseeable consequences." See Smith v. Gore, 728 S.W.2d 738, 749 (Tenn. 1987) (emphasis added) ("[I]f some definable policy relieves [d]efendants of the responsibility for the otherwise foreseeable consequences . . . , then they cannot be held liable . . . .").  This prong recognizes that, at times, personal recovery for an injury should yield to the interests of the general welfare. See id. at 746-47.  Our state's public

policy "is to be found in [our] constitution, statutes, judicial decisions and applicable rules of common law." Id. at 747 (quoting State ex rel. Swann v. Pack, 527 S.W.2d 99, 112 n.17 (Tenn. 1975)). Although our state's public policy clearly establishes that prisons and jails are not subject to strict liability for inmate injuries, see Gillespie v. Metro. Gov't, No. 01A01-9109-CV-00317, 1992 WL 9441, at *1 (Tenn. Ct. App. Jan. 24, 1992), it does not prevent recovery for foreseeable injuries, Tenn. Code Ann. § 29-20-205 (2012) (removing governmental immunity for injuries that are proximately caused by a government employee's negligent act); see also Gillespie, 1992 WL 9441, at *1 (recognizing that jails are subject to liability when they fail to use reasonable care in preventing foreseeable attacks). I would hold, therefore, that the trial court properly found no limitation of recovery grounded in public policy.

As to the third prong, in order to have granted relief, the trial court had to have found that the incident was reasonably foreseeable under these specific circumstances. I would hold that the evidence does not preponderate against that finding.[2]

Because the analysis of foreseeability is not limited to an examination of whether the detention facility was on actual notice of a likely attack, see Sanchez v. State, 784 N.E.2d 675, 679 (N.Y. 2002) (holding that foreseeability does not require "proof . . . that the State actually knew that the assault was about to take place"), the inquiry should include an assessment of all of the relevant facts, direct and circumstantial, as to the risk of potential harm, see id. (concluding that facts relevant to foreseeability include "what the State reasonably should have known—for example, from its knowledge of risks to a class of inmates based on the institution's expertise or prior experience, or from its own policies and practices designed to address such risks"). Notably, in the prison context, foreseeable injuries can even include harm that an inmate is likely to suffer because of his or her own self-destructive conduct. See, e.g., Cockrum v. State, 843 S.W.2d 433, 436 (Tenn. Ct. App. 1992) ("[C]ourts consistently hold that custodians have a duty to protect prisoners . . . from reasonably foreseeable self-destructive acts."); see also Bartlett v. Commonwealth, 418 S.W.2d 225, 227 (Ky. 1967) (allowing a negligence claim involving an inmate-on-inmate attack to proceed where the injured party was "an individual who was prone to irritate and exasperate his fellow inmates").

_____

[2] Because of its determination of the proximate cause element, the majority does not reach the issue of apportionment of damages. A trier of fact has broad discretion in allocating fault, Wright v. City of Knoxville, 898 S.W.2d 177, 181 (Tenn. 1995), and the amount of damages awarded will only be altered if the trial court adopted the wrong measure of damages or the evidence preponderates otherwise, Huskey v. Rhea Cnty., No. E2012-02411-COA-R3-CV, 2013 WL 4807038, at *12 (Tenn. Ct. App. Sept. 10, 2013). In my assessment, the trial court had a proper evidentiary basis for the award of damages.

4

Because foreseeability is a question for the trier of fact, McClenahan, 806 S.W.2d at 775, proximate cause should be decided by trial courts rather than the appellate courts, "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." Wilson v. Americare Sys., Inc., 397 S.W.3d 552, 559 (Tenn. 2013) (emphasis added) (quoting Hale v. Ostrow, 166 S.W.3d 713, 718 (Tenn. 2005)). Although subject to de novo review, findings of fact must be evaluated with a presumption of correctness. Tenn. R. App. P. 13(d). That is, the ruling should not be overturned unless the evidence preponderates otherwise. Id.[3] In my view, the trial court in this instance, as the finder of fact, had an evidentiary basis for concluding that the type of harm suffered by the Plaintiff was reasonably foreseeable.

After having been arrested and transported to jail based upon erroneous information as to the status of his driver's license, the Plaintiff was, as pointed out by the trial court, understandably upset. Because of his vociferous insistence that his arrest had to be some kind of mistake, the Plaintiff, charged with a minor traffic offense, was classified as "medium security" and placed in a cell with six other inmates, four of whom were charged with violent crimes. On the following morning, when appearing before the General Sessions Court, the mistake was discovered, and the Plaintiff was ordered to be released. Instead of being immediately released from the detention facility, however, the Plaintiff waited more than three hours for the officer who was charged with the responsibility of processing

---

[3] There are important policy considerations underlying our limited scope of appellate review in regard to findings of fact. As one commentator has observed,

> Standards of review help judges in trial and appellate courts maintain a healthy respect for the others' strengths. . . . They force the appellate court to recognize that the trial court proceedings were not just a warm-up exercise for the appellate court and that the decision reached in the lower court should be the final determination unless, of course, the error was harmful.

Amanda Peters, The Meaning, Measure, and Misuse of Standards of Review, 13 Lewis & Clark L. Rev. 233, 239 (2009) (footnotes omitted).

One of the primary strengths of the trial court as a trier of fact is that it is "in the best position to discern the truth, having heard testimony first-hand along with all the eye-twitches, sweaty brows, pregnant pauses and other non-verbal cues that accompany it. [Fact finders] also get to see the physical evidence in person." Randall H. Warner, All Mixed Up About Mixed Questions, 7 J. App. Prac. & Process 101, 104 (2005). "All the appellate court gets," in contrast, "is a cold record." Id.; see also Chad M. Oldfather, Appellate Courts, Historical Facts, and the Civil-Criminal Distinction, 57 Vand. L. Rev. 437, 445 (2004) ("Whether judge or jury, the finder of fact at the trial level is present in court as the evidence comes in. The fact finder thus enjoys an advantage over appellate courts in that it experiences the introduction of evidence and testimony as it happens. Because of this, the factfinder can assess not only what a witness says, but also how she says it." (footnote omitted)).

releases. When that officer failed to exercise her duty, the indignant Plaintiff, who had been ordered released, was returned to the same cell—a potentially volatile situation.

In its ruling, the trial court found that the Plaintiff openly expressed his frustration during the arrest process and, after being ordered released at his court appearance on the following morning, he continued to

> ha[ve an] attitude once [he was taken] back to jail[,] . . . after [he] should ha[ve] been released . . . . And when one of the inmates said something to [him], whether it was about drugs or anything else, [he] went off . . . [exhibiting] exactly the same reaction that [he] had [earlier] with [the officer] . . . and maybe justifiably so.

(Emphasis added.) After an extensive recitation of the evidence, the trial court made the following observation: "I have no doubt in my mind when [Officer McCloud] didn't show up [the Plaintiff] was mad just like he was mad with" the arresting officer on the night before. This factual assessment is determinative, in my view, on the foreseeability component. That is, the detention facility officers were more likely than not on notice of the volatility of the situation.

The majority relies in great measure on the trial court's comment that the assault was "spur of the moment" as support for its conclusion that the assault was not reasonably foreseeable. In my opinion, this statement, in proper context, was a reference to whether the Anderson County officials were negligent in supervision—only one of the three theories of recovery—a theory the trial court rejected. During its discourse, the trial court stated that

> Anderson County was a direct supervision jail, and I so find. And again, it's based upon not just the total hours that they're outside in the facility, it's based upon all the things including that the officer is in the pod with them, has direct contact many times, often every day. [The expert's] opinion was that [the Plaintiff] was assaulted because he had been talking about the drugs and that's part of the reason for the spur of the moment assault.
> . . . .
> [The expert] found that . . . it's [a] direct supervision jail, that [the Plaintiff] was appropriately supervised, and I so find.

Like the Court of Appeals, I construe this statement as a determination that Anderson County properly supervised the inmates and did not have any further responsibility under the circumstances to segregate the Plaintiff or provide additional security. King, 2012 WL 5960838, at *5. Construed this way, the trial court's determination that the assault was "spur

6

of the moment" simply means that it occurred very suddenly. Applying this interpretation to the Plaintiff's claim of negligent supervision, the trial court concluded that even with reasonable supervision by jail authorities, the sudden altercation between the Plaintiff and Mr. Paul could not have been prevented. See Sanchez, 784 N.E.2d at 679 (observing that reasonable supervision does not require "constant guarding and watching" (quoting Flaherty v. State, 73 N.E.2d 543, 544 (N.Y. 1947))). The same principle applies differently to the theory of timely release, however, because it is foreseeable that incarcerating a temperamental inmate beyond the time of his entitlement to release could result in harm, and that officials may easily prevent that harm by processing releases in a timely fashion. I do not, therefore, believe that the trial court's "spur of the moment" reference should be extended to the officers' failure to release the Plaintiff on a timely basis.

Our review is limited to the transcript of the proceeding. The trial judge saw and heard the witnesses firsthand. This Plaintiff was found by the trial court to have been mistakenly charged with a traffic offense. When he strenuously protested being taken into custody, he was jailed with inmates charged with violent crimes. After a night in jail, the Plaintiff was taken to court and ordered released. After more than a three-hour wait for processing, officers, absent any basis for doing so, placed him back into the same cell with the same inmates, where he was assaulted. Under these circumstances, it is my opinion that the trial court properly found as foreseeable that the Plaintiff, wrongly imprisoned, would lodge strong and perhaps offensive objections, whether to law enforcement officers or to individuals in his cell, and that Anderson County officials should have timely processed his release as a means of avoiding the conflict. The trial court described the Plaintiff as justifiably indignant.[4] I would defer to those findings.

### III. Conclusion

In summary, I do not find that the facts preponderate against the trial court's finding of proximate cause and award of damages. Accordingly, I would affirm the judgments of the trial court and the Court of Appeals.

_____
GARY R. WADE, CHIEF JUSTICE

---

[4] The trial court found that the Plaintiff was angry about being incarcerated and was confrontational. Although the Plaintiff testified that he was "scared" when he was initially housed in his cell, only the emotional state apparent to the detention facility officials at the time the Plaintiff should have been released is relevant in assessing whether the injury was reasonably foreseeable. See Doe v. Linder Constr. Co., 845 S.W.2d 173, 178 (Tenn. 1992) ("Foreseeability must be determined as of the time of the acts or omissions claimed to be negligent.").