IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 24, 2015 Session
Assigned on Briefs March 11, 2015

**IN RE MAKENZIE L.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT172865, No. 20131558     Ben H. Cantrell, Judge**

_____

**No. M2014-01081-COA-R3-PT – Filed June 17, 2015**
**No. M2014-02285-COA-R3-PT - Filed June 17, 2015**

_____

In this termination of parental rights case, paternal great-aunt and great-uncle, who were named "primary residential parents" of a minor child, filed a petition to terminate the parents' rights to their daughter on the grounds of persistence of conditions that led to removal, severe abuse, abandonment by failure to visit, and abandonment by failure to support. The trial court held that grounds did not exist for termination and returned the child to the custody of the parents. We have reviewed the record and affirm the trial court's findings with respect to persistent conditions and abandonment by failure to visit. However, we have determined that the trial court erred in excluding evidence of alleged sibling abuse in rendering its decision that the grounds of severe abuse were not proven. In addition, we hold that there is clear and convincing evidence that the parents abandoned the child by failing to support her in the four months preceding the filing of the petition. Finally, we affirm the trial court's holding with respect to attorney's fees. Therefore, having found that the trial court erred in failing to consider evidence of alleged sibling abuse and that a ground exists for termination, we remand the case for the trial court to consider whether the ground of severe abuse, as defined by Tenn. Code Ann. § 36-1-113(g)(4) is proven by clear and convincing evidence and whether termination of parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Gary M. Williams, Hendersonville, Tennessee, for the appellants, Ronda and Eugene Melton.

Connie Reguli, Brentwood, Tennessee, for the appellees, Adam and Ashley E.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Makenzie L. was born in May 2008 to Ashley L. ("Mother") and Adam E. ("Father") (collectively, "the parents"). At the time of Makenzie's birth, Mother was married to Brett L.; however, it is undisputed that Adam E. is Makenzie's biological father. When Makenzie was approximately six weeks old, Mother and Father left her in the care of Father's aunt and uncle, Ronda and Eugene Melton (collectively referred to as "the Meltons"). In 2009, Mother and Father had a son, Ashton L. When Ashton was approximately one month old, Mother and Father left him in the care of his paternal grandmother, Patricia Sparks. Ashton is not the subject of this appeal.[1]

February 2012 Order Naming the Meltons as Makenzie's Primary Residential Parents

In 2011, the Meltons filed a petition seeking to restrict Mother's and Father's visitation rights.[2] The case was heard by the Sumner County Juvenile Court, and an order was entered February 1, 2012, in which the trial court named the Meltons as Makenzie's primary residential parents. In support of its finding that it was not in Makenzie's best interest to be in Mother's and Father's custody, the trial court found:

> 13. The Court does find that the parents Ashley and Adam E[.], do have domestic violence issues and have subjected the children to their domestic violence.
>
> 14. The Court finds that the parents, Ashley and Adam E[.], denied all the allegations. The Court does not put credence in their testimony and finds that the majority of their testimony is perjured.
>
> 15. The Court finds that the parents did little to get their children back prior to the filing of the Complaints and that they were satisfied to have the

---

[1] Mother and Father had another child, Levi, born in 2013; Levi resides with Mother and Father and is not the subject of this appeal either. Mother also has a son, Eric L., from her first marriage, who is in the custody of his father, Mother's ex-husband. Eric is also not involved in this appeal.

[2] Ms. Sparks also filed a petition to limit Mother's and Father's parenting time with Ashton. Ms. Sparks's petition was consolidated with the Meltons' petition for purposes of the final hearing.

children with relatives. They exercised sporadic parenting time at best; and, that they paid little to no child support although the caregivers did not ask for any child support.

16. The Court recognizes parents have superior rights over any third party or government intervention unless it is proven that the child is in danger due to the parents['] actions or lack of actions.

17. The Court finds Ms. Sparks and the Meltons have the best interest of the children at heart but that it will be difficult for them to work with the Court in an effort to reunite the children with their parents.

18. The Court finds that due to the children being with the Petitioners since newborns, removing them from the Petitioners would be improper and abusive to the children. It is in the best interest of the minor children, at this time, for Patricia Sparks to be named as the primary residential parent of the minor child, Ashton L[.], and for Ronda and Eugene Melton to be designated as the primary residential parent of the minor child, Makenzie L[.]. It is not in the best interest that the minor children be returned to the custody of Ashley E[.] and Adam E[.] at this time.

19. The Court finds that the parents have domestic violence issues and because the Court has little credence in their testimony, the Court has concerns about the moral ability of the parents to raise the children at this time. The Court reiterates its findings that it is not in the best interest of the children to place them back in the custody of Ashley E[.] and Adam E[.] at this time.

20. The Court admonishes the Petitioners to work together with the parents in support of reuniting the parents with their children.
. . .
It is, accordingly,

ORDERED, ADJUDGED AND DECREED that Ronda Melton and Eugene Melton are designated as the primary residential parents of [Makenzie] L[.] pending further Orders of the Court.

The court awarded parenting time to Mother and Father during alternating weekends, on holidays, and during the summer.

On July 30, 2012, Mother and Father visited with Makenzie and Ashton. When the children were returned to their respective primary residential parents, it was discovered that Ashton had suspicious marks on his face and neck. Ashton was

3

examined, and the Department of Children's Services ("DCS" or "the Department") became involved. After this incident, Mother and Father's visitation with Makenzie and Ashton ceased, although there was no court order requiring cessation of Mother's and Father's visits with Makenzie. By letter dated March 12, 2013, Mother and Father's attorney requested the Meltons to abide by the February 2012 order awarding parenting time to Mother and Father.

April 2013 Petition to Terminate

The present appeal arises from the Meltons' filing a petition on April 11, 2013, to terminate Mother's and Father's parental rights on the grounds of persistent conditions, severe abuse, and abandonment by failure to visit and support in the Davidson County Juvenile Court.[3] Attached to the petition were letters from Makenzie's pediatrician and therapist who wrote in support of the petition to terminate. On April 19, 2013, the Meltons filed an emergency *ex parte* motion requesting the court to suspend visitation with Mother and Father. The trial court granted the order that same day and suspended Mother's and Father's visitation "pending further orders of the court."[4]

Several motions and orders were filed, including a petition for criminal contempt by Mother and Father, which was ultimately nonsuited. A special judge was assigned to hear the case following the recusal by the trial court judge. Prior to the hearing, Mother and Father filed a motion *in limine* requesting the court to exclude any "statements in the medical records from Patricia Sparks or Ronda Melton, which are reported comments made by Ashton [L.] or Makenzie [L.]"

The Hearing

The trial court held a hearing on the petition to terminate on March 4, 5, and 6, 2014. Prior to hearing proof, the court announced its ruling on Mother and Father's motion *in limine*, stating: "it seems to me that the motion to restrict the treating professionals' testimony, with respect to what has happened to Ashton, is well taken, that's simply not - - it's not relevant to this proceeding."

The Meltons called Janet Weismark, a licensed clinical social worker as an expert witness. Ms. Weismark testified that she began counseling Makenzie in May 2011 and

---

[3] Prior to filing the petition to terminate, the Meltons filed a Petition for Adoption and to Terminate the Parental Rights of Adam E[.] and Ashley E[.] in the Roberston County Chancery Court on February 11, 2013. That petition was ultimately dismissed. We will discuss this portion of the procedural history as it relates to the issues on appeal.

[4] In the May 7, 2014, memorandum and order, the trial court stated that Makenzie did not see her parents from July 31, 2012, until "this Court allowed supervised visitation in December of 2013." However, there is no order reflecting this award of supervised visitation in the record.

4

had engaged in approximately forty counseling sessions with Makenzie. Ms. Weismark's testimony focused on counseling sessions that occurred from February 2012 to July 30, 2013. Ms. Weismark's "progress notes" from those counseling sessions were entered into evidence. When asked what statements or revelations Makenzie made regarding potential abuse in Mother and Father's home, Ms. Weismark testified that Makenzie reported: "when she cried her [M]other says 'go away'"; that she had to change her little brother's diapers; that her parents told her little brother not to "mess in his diapers anymore"; that she burned her finger at her Mother's house on an overturned lamp; that her Mother and Father "popped her on the butt"; that she observed Mother and Father taking a bath together and her Father "playing with his private part in front of her"; that her Father swore at a broken tv set; that she witnessed her Mother hit Ms. Melton; that she and Ashton were allowed to play outside in 108 degree weather and that Ashton threw up; that she witnessed Ashton being hit in the face by Mother; and that Mother "smacked" her in the face. Ms. Weismark further testified that Makenzie drew a hand with long colored fingernails and talked about her Mother "scratching Ashton's face." Makenzie also stated she was having nightmares about a witch who was going to take her away from the Meltons.

At a counseling session on December 19, 2012, Ms. Weismark recorded the following progress notes:

> Client said there was a time her mother (Ashley) put her and her brother in the attic. She talked about the attic door being in the ceiling . . . a string on the door. Ashley closed the attic door and left her and her brother there. We screamed and daddy heard it and he got us out. When Adam and Ashley fight, she feels scared.

Ms. Weismark's progress notes for a counseling session on February 27, 2013, state:

> Makenzie said her mother put her in the bathroom [with] her brother (in the brick house) and told them wait there. She brought a rope and tied them up and then went to watch TV. "I cried. I almost died because it was on my throat." Ashton cried too. Adam was at work. Makenzie said she was able to get out of the rope and go to her room and watch TV.

During her counseling visits in March, April, and May, Makenzie discussed "fearful feelings" and described Mother and Father as "mean." In June, Makenzie reiterated that "Ashley put Ashton in the attic because he kept pooping in his diaper."

On cross-examination, Mother and Father's counsel pointed out that when Makenzie disclosed that she had been tied up with a rope, Makenzie "ha[d]n't been around her parents for some six months plus." Ms. Weismark also testified that Makenzie disclosed that Ms. Melton "spanked" her. On re-direct examination, Ms.

5

Weismark addressed Makenzie's delay in disclosure of the rope incident and stated, "Well, sometimes in, traumatic events, children put them out of their mind. And then once they feel really safe, they'll come out with it."

Next, the Meltons called Dr. Catherine Dundon and tendered her as an expert witness in pediatrics. Dr. Dundon testified that she treated Makenzie for "routine check-ups and all common childhood illnesses." Dr. Dundon testified that Ashton is also her patient. When Dr. Dundon was beginning to discuss her observation of Ashton following an incident in 2012, counsel for Mother and Father objected to the introduction of a photograph of Ashton's injuries. The following colloquy resulted:

> THE COURT: Well, I think we've been through that. And I have said that the abuse of Ashton is not relevant to this proceeding, unless it somehow amounts to abuse to Makenzie. Now, I'm not sure that this witness can give us an opinion about whether or not what happened to Ashton is an abuse of Makenzie.

> [Meltons' Counsel]: Well - - And I certainly understand and respect that, Judge. But severe abuse of one sibling can be used in a - - or petition to terminate parental rights. I mean, even - - We're alleging that the abuse of Ashton could certainly be considered by [t]his Court in this petition to terminate as relates to Makenzie. Because the abuse of one sibling has relevance, if it please [t]he Court.

> THE COURT: Well, I think we're going to spend a lot of time on that, and so I'm going to sustain the objection.

When asked about her concerns as it relates to abuse of Makenzie, Dr. Dundon stated:

> When the incident occurred with the brother, there had been so much trouble with coordination, the two children live in different counties and different D.C.S.s and the parents were in a different county. And I'm listening to all those concerns and it's not -- So we -- I kind of thought, finally, when we had concrete evidence on Ashton, and when I spoke with the people at Vanderbilt and social workers -- Their business, they do a lot of child abuse -- that this would be enough to protect the children 'cause it's hard -- It is subjective and lots of bruising and lots of stories and different people telling me whatever.

> But then there was concern that they would apply that to Makenzie, even though she's only a year older and right there in the household at the same time, that it might not apply to her and that we needed to make a

6

statement about her separately. And I think there was family 'cause they're in the custody of a paternal great-aunt and a paternal grandmother, instead of one person. And so I asked if -- if they -- she would help me pull information together and then I would make a report for Makenzie, which isn't as concrete as Ashton, where I feel fairly certain of my stand and what I saw. Just lots of concerns with Makenzie with bruising, with statements being locked up in closets and inappropriate discipline and negative statements and fearful statements and not working together as a family, trying to say awful things about caretakers and just destructive.

Next, Ronda Melton took the stand. After several objections, the trial court requested the Meltons' attorney to focus his questions on events occurring after the February 2012 order was entered. When asked how much visitation Mother and Father have had with Makenzie since February 2012, Ms. Melton responded that they visited with her "sporadically." Ms. Melton recounted several occasions where Mother and Father would cancel their scheduled visitation with Makenzie. On one occasion they canceled to "move someone" and another time they canceled because of illness. Ms. Melton testified that Mother and Father "never sent Makenzie a card, a present, anything, the entire time that we've had her . . . they've never called and wished her a happy birthday, they've never called her when she's been sick." Ms. Melton stated that Mother and Father gave Makenzie a horse a "few weeks ago" after the court ordered supervised visitation. Ms. Melton stated that Mother and Father failed to show up for visitations on President's Day and on Memorial Day without explanation.

Ms. Melton explained that Mother and Father often cursed at the Meltons when the parties would meet at the designated spot for parenting time exchanges. In June 2012, the hostility between the parties became physical when Mother put her finger in Ms. Melton's face and Ms. Melton "pushed her hand out of the way . . . [and] she started tearing into me, hit me; pulling my hair; fighting at me; calling me names. She said 'I'm gonna f--- you up, b---- . . . .'" The children were present during the altercation.

Ms. Melton testified that in July 2012, Mother's and Father's visitation with Makenzie ceased. She stated that "D.C.S. stopped it" following an incident with Ashton. The specifics of the incident with Ashton were not discussed due to the trial court sustaining several objections by Mother and Father's counsel. Ms. Melton then explained that Mother and Father did not visit with Makenzie, nor did they call the Meltons to check on her, from July 2012 to April 2013. Next, Ms. Melton was asked whether Mother and Father ever provided financial support for Makenzie. She answered:

A. There was only one time that they . . . ever give Eugene and I some money, and that was . . . when she was a baby. . . . Probably four years ago.
Q. Okay. Since that time, have you received any financial assistance, whatsoever, from either the mother or the father?

A. No, it was just that one time.

. . .

Q. Well, have the parents been by your house and dropped diapers off or clothes or food, things of that nature - -

A. No.

Q. - - for their child?

A. Never.

. . .

Q. Have they ever inquired of you as relates to what they need to do to assist in paying the medical expenses?

A. No.

Q. What about the counseling expenses?

A. No.

. . .

Q. Have you ever received any child support from your efforts to have the parents pay child support?

A. No.

Next, Ms. Melton was asked to discuss any evidence of abuse Makenzie exhibited following visits with Mother and Father from February 2012 until the visits with Mother and Father ceased in July 2012. Ms. Melton stated:

> She - - she's had bruises on her, she's had a bruise on her side before, she's had scratches on her neck and her chest, she's had a bruise on her forearm and a bruise on her buttocks before. She came home with burns on her fingers and a cut on the other hand, at the same time.

Finally, Ms. Melton testified that she and Makenzie had a strong bond and that Makenzie was performing well in school.

On cross-examination by the parents' counsel, Ms. Melton admitted that she did not notify Mother and Father of every counseling session Makenzie attended, as the February 2012 Order required. Ms. Melton also confirmed that she did not have any "out-of-pocket expenses" for Makenzie's medical care because Makenzie was on TennCare.

The guardian ad litem asked Ms. Melton why she felt it was in Makenzie's best interest for Mother and Father's parental rights to be terminated, and Ms. Melton responded:

> Well, because they've never really actually had much visitation with her. I mean, from the time she was born, we've been keeping her for weeks

8

and months at a time. They went off and left her without letting us know where they were going or how long they were gonna be gone.

You know, we've had her - - Like, one time we had her two-and-a-half months straight, and we didn't even know where they were.

So, you know, all these times that she's been with us, from the time she was two weeks old on, she's been with us 80 to 90 percent of her life, until we got her, you know, the temporary custody and then full custody with Judge Brown.

Eugene Melton was the next witness. He testified that he works 75 to 80 hours per week as a paramedic and earns approximately $95,000 per year. He stated that he loves Makenzie "like she's my kid" and has been happy to provide for her over the past several years. On cross-examination, Mr. Melton admitted that he filed for bankruptcy in 2002. He stated that he has borrowed money to pay for his legal fees in the present case. He also testified that his wife has long fingernails that are akin to the drawing Makenzie provided to her therapist. When cross-examined by the guardian ad litem, Mr. Melton reiterated that the parents have not paid "so much as a penny" in child support for Makenzie.

Patricia Sparks, Makenzie's paternal grandmother, testified next. She explained that she has custody of Ashton, Makenzie's younger brother. Ms. Sparks testified that she makes an effort to allow Ashton and Makenzie to spend time together and that she communicates frequently with Ms. Melton. She described witnessing positive interactions between Makenzie and the Meltons and discussed several outings that she and Ashton went on along with the Meltons and Makenzie. Ms. Sparks testified regarding a voicemail she received from Father in December 2012, and the voicemail was played into evidence. Ms. Sparks believed that Father left the voicemail by mistake and that she could hear the parents screaming at each other and Father accusing Mother of cheating on him. On cross-examination, Ms. Sparks testified that Mother and Father initially left Ashton in her care in order to be in Florida to care for Ms. Sparks's brother, who was very ill.

Next, Mother was called to testify by the Meltons' attorney. She stated that she is twenty-seven years old and has four children. Her oldest son, Eric L., is in the custody of her ex-husband, and she has not exercised visitation with him because her ex-husband "totally cut off all communication" with her when she married Father. Mother is a "stay-at-home-mom" with her six-month-old son, Levi. She stated she has not worked since February 2012. Mother testified that Makenzie initially went to stay with Ms. Melton when Makenzie was approximately six weeks old because Mother had to go work with Father out of town.

When asked regarding the efforts she made to see Makenzie subsequent to February 2012, Mother answered:

> A. From February of 2012, we had visitations with Makenzie until July, the end of July of 2012.
> Q. What happened to your visitations in July of 2012?
> A. We got a phone call from Jamilla Frazier[5] saying that they had been suspended. And she had asked us to sign something, and we were not gonna sign it. So then I went - - We went and hired - - we hired our attorney, David, he said "don't do anything," he told us to just sit still and pause - -

Mother stated that she did not keep records of her parenting time or the dates that she showed up to exercise parenting time. When asked what she had done subsequent to February of 2012 to try to get Makenzie back, Mother responded that "we have paid over $70,000 in attorneys [fees] to try to get Makenzie back." The questioning then turned to whether Mother had paid any child support or had offered any financial support to Makenzie:

> Q. May I ask you, ma'am, have you paid a nickel for the financial support of Makenzie?
> A. Like I said, I had - - I'm paying - - we're paying a thousand dollars - -
> THE COURT: Wait, wait, wait. The question was how much have you paid for Makenzie. Now, answer that, and then you can explain it
> . . .
> A. We have - - I haven't been ordered to pay child support for Makenzie.
> THE COURT: Well, no, no - - . . . How much have you paid, answer that first.
> THE WITNESS: Nothing.
> THE COURT: Okay. Then you can explain it.
> THE WITNESS: The reason why is because we're paying our attorney a thousand dollars a month. Number Two, I've never been ordered to pay child support. Number three, I'm not even working, I - - How would I provide even child support for Makenzie myself. Adam is the provider of the home, we are married, that is her father.

Mother then testified that she believed her children had been "stolen" from her and that the Meltons had "manipulated us and . . . the courts to take our children." When asked about the injuries that Makenzie had following visits with Mother and Father (such as a burned finger or bruising), Mother responded that "accidents are gonna happen . . . [k]ids are very exploratory and are going to fall; they're gonna touch things; . . . things

---

[5] Jamilla Frazier is apparently an employee of DCS.

are gonna happen, that is part of learning with them." Mother testified that she didn't call or send a card to Makenzie on her fifth birthday because she is "afraid to call the Meltons." Mother stated she didn't know whether she notified the Meltons when she moved, but that she felt like it was her "attorney's job" to notify them.

The guardian ad litem then cross-examined Mother. Mother stated that she and her husband are financially able to care for Makenzie, that she has a room set up for Makenzie in her home, and that she is able to take her to school. The guardian ad litem asked Mother regarding the February 2012 ruling as follows:

Q. Can you just tell me in as plainest terms as you can what you think that order says about being reunited with your children?
A. I believe, in my terms, like Judge Brown left it up to the custodians to reunite us with our children.

Mother testified that she never put Makenzie in the attic and that her attic did not have a string; rather, it has a handle on the door. Mother testified that she did not contact Makenzie from July 2012 to December 2013 because she "had no way to." She stated she never sent Christmas presents because "we were afraid that Ronda wouldn't give them to her" and that she was scared to contact the Meltons.

Mother was again questioned about her financial support of Makenzie:

Q. The reason I ask is because you understand that Makenzie [needs food, clothing, etc.] too, right?
A. Exactly.
Q. And you feel like you have an obligation to pay for that for her?
A. Yes.
Q. You do?
A. When she's with us.
Q. But not when she's with the Meltons?
A. I have not been ordered to pay child support.
Q. I understand that. But you don't think you have any obligation to pay for any of those things for your daughter?
A. They've never asked.

On cross-examination by her counsel, Mother testified that when Makenzie would visit, she would repeatedly ask when would she be able to live with Mother "for good." Several photographs of Mother with Makenzie were entered into evidence. When asked to describe any indications that Makenzie was emotionally or psychologically abused at the Meltons' home, Mother stated that Makenzie told her she had to "clean up cat vomit"; scrub the floors; that Ronda spanks her; and that Makenzie discussed talking with the "judge." Mother also described the altercation between herself and Ms. Melton. She

11

stated that Ms. Melton punched her in the back. Mother stated that she doesn't abuse drugs, that she isn't a smoker. Mother testified that she did try to go to the parenting exchange spots between August 2012 and April 2013 but that the Meltons never showed up. Mother admitted that she didn't have any records or a calendar to confirm the dates she showed up because she doesn't "document [her] life." Mother stated she was unaware that Makenzie was in counseling until the guardian ad litem mentioned it to her. Mother described a supervised visitation she had with Makenzie on December 22, 2013. She stated that Makenzie enjoyed the visit and that their interactions were positive.

The trial court judge interjected and posed the following questions to Mother:

THE COURT: All right. Ms. E[.], I have a couple of questions. And I don't want to open up this wh[o]le case, but your position has been consistent that the Melton's [sic] stole your child from you; is that correct?
THE WITNESS: Yes.
THE COURT: When was the first time, if you remember, that you asked to get your child and they refused to let you have her?
THE WITNESS: In March, when they filed the order to have - - to have an emergency removal, I tried to go pick her up that Monday that I was supposed to go pick her up, and they didn't - - I don't - - they didn't even have the order signed 'til, I think, it was the day after. And Ronda kept her from me and prevented me from picking her up.
THE COURT: And that was what year?
THE WITNESS: Two-thousand-eleven, when this all started.
THE COURT: All right. You also said in your testimony yesterday that the reunification wasn't working. So what was it that wasn't working about the reunification?
THE WITNESS: The Melton's [sic] would not work with us to bring her back. They never wanted to increase any visitation. We went by the court order, there was no reason for them not to go by the court order to reunion - - reunify us with her. They have wanted her since they have - - from the beginning. They have always wanted Makenzie 'cause Ronda has always wanted another daughter.
            The more that I let Makenzie stay with them - - because I trusted her as a family member and as a babysitter, I wanted her to spend time with Makenzie, she enjoyed it, Makenzie enjoyed it. But I didn't think this would happen from it, and I never got my baby back.

On re-direct examination, Mother admitted that she had been served with a petition to set child support in June 2012. Mother stated that she gave the child support petition to her attorney and she "never heard anything else about it."

Kathy Williams, the executive director of Court Appointed Special Advocates ("CASA") in Robertson County, testified next. Ms. Williams testified that CASA was appointed to investigate Makenzie's case in September 2012. Ms. Williams stated that the parents' attorney gave her phone numbers and two addresses to use to reach the parents, but that neither of the phone numbers worked. Ms. Williams visited Makenzie in the Meltons' home, and Makenzie was very well taken care of and seemed to be a very "well-adjusted child." On cross-examination, Ms. Williams admitted that she did not go to the parents' home, nor did she try to send a letter to the addresses she had on hand.

James Porter was called by the parents' attorney to testify next. He stated that he became a DCS caseworker for Makenzie in the fall of 2012. Mr. Porter testified that he did not do anything to stop the visitation between Makenzie and her parents. Mr. Porter observed a forensic interview of Makenzie and stated that Makenzie did not disclose any occasions of physical or sexual abuse during that interview. Mr. Porter stated that he did not investigate the allegations of abuse regarding Ashton because Ashton's case was assigned to another county.

The Meltons' attorney questioned Father next. Father testified that he is employed by Garland Nissan and makes over $100,000 per year and that he made over $100,000 in 2012. When asked whether he pays any child support for Makenzie, he stated, "I'm not ordered any child support," and later answered that he had not given any financial support to the Meltons for their care of Makenzie. Then Father stated that, "[t]he support I have given for Makenzie is that I've spent probably close to $100,000 trying to regain custody of my own child that was stolen from me." Father stated that he has not attempted to place Makenzie on his insurance coverage, but that she could "be added very easily." Father testified that he did not have any contact with Makenzie from July 2012 until December 2013. Father stated that the Meltons "were ordered to reunite them with us, and they did not. It's not my place to call the Melton's when - - Every time that we have any contact with them, something bad comes from it." Father stated that he never contacted Makenzie's pediatrician because he did not know who her pediatrician was.

When examined by the guardian ad litem, Father stated that he was ready to meet Makenzie's needs by regaining custody of her. Father stated that it was "impossible" to work with the Meltons to reunify him and Mother with Makenzie. Father denied ever putting Makenize in the attic, ever tying her up with a rope, or ever doing anything that was sexually inappropriate to or in front of Makenzie.

The parents' attorneys called Angela Warden, Mother's sister, to testify next. She testified that from her observation, Mother and Makenzie had a "really good" mother-daughter relationship. On cross-examination, Ms. Warden stated that, since February 2012, she had been in the parents' home to witness visitation on two or three occasions.

Finally, Matthew Williams, Father's friend, was called to testify on behalf of the parents. Mr. Williams testified that he had never witnessed any domestic violence between the parents.

## Trial Court's Order

The trial court entered an order on May 7, 2014, dismissing the Meltons' petition to terminate for failure to prove the grounds for termination alleged. The trial court held that Mother's and Father's failure to visit and support within the four-month period preceding the filing of the petition to terminate was not willful. With respect to abandonment by failure to visit, the court stated:

> Although the Sumner County Juvenile Court enjoined the parties to work together to reunite Makenzie and her parents, those efforts never worked without conflict. The [parents] are not without blame, but once the juvenile court had spoken, the Meltons had a duty to recognize that the parents' rights were paramount and that they shouldn't continue to assume the parental role.
>
> After July 30 of 2012, the Meltons started proceedings on multiple fronts to terminate the [parents'] right to visit and ultimately to terminate their parental rights. Their pleadings contain a parade of horribles on the part of the [parents], but as the proof has shown, the only significant change since February 2012 was the fact that DCS had started a dependent and neglect investigation concerning Ashton.
>
> In March of 2013, the [parents] filed an answer to the petition to terminate parental rights in Robertson County. They also counter-claimed for custody and notified the Meltons that they were insisting on compliance with the juvenile court's visitation order. In short order the case was transferred to Davidson County, non-suited, and re-filed in this Court on April 11. By April 19 the Meltons had obtained an ex parte order shutting off the [parents'] right to visit.

When discussing failure to support, the court stated:

> The failure to pay anything toward support is another matter. The [parents'] excuses (not being ordered to pay support and their extraordinary legal expenses) do not merit much consideration from this Court. "In Tennessee, biological parents are expected under the common law to understand, even in the absence of a court order, that they have an obligation under the law to support their children if they have the ability to do so." *Smith v. Gore*, 728 S.W.2d 738 (Tenn. Ct. App. 1987). However, when parents do not have

14

custody of their children, the nature and extent of their duty may be defined and controlled by external factors other than ability to support. "In these circumstances, the nature and extent of the duty to support may be based on a court order defining the support obligation." *In re M.J.B.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004). The Court finds that because the [parents] were visiting with Makenzie prior to July 31, 2012 under a plan to restore custody to them and thereafter were actively seeking custody, they were seeking to support her. The record also shows that the [parents] were following the process of the Child Support Division of the District Attorney in establishing any support that may have been due. There is no evidence that they were not cooperating in that process. So under all the circumstances of this case, the Court concludes that the failure to pay support was not willful, either.

The Court, therefore, finds that the proof fails to show any ground for the Court to terminate the [parents'] parental rights.

With respect to severe abuse, the trial court stated that it "does not believe that Makenzie's stories of being locked in the attic and being tied up in the bathroom actually happened" and the court found "there is no proof of any exposure of Makenzie to abuse or neglect that is likely to cause her great bodily harm or death." In a footnote, the trial court stated:

> Under Tenn. Code Ann. § 36-1-113(g)(4) the Court can find severe child abuse of a sibling as grounds for termination; however, any evidence heard by the Court regarding Ashton was not sufficient to find that he was subjected to severe abuse as defined in § 102, nor is there any order in the record making such a finding.

The court further pointed out that the "sole reason" the trial court provided for giving primary custody to the Meltons in 2012 was the prevalence of domestic violence between Mother and Father. The court stated that "[t]he only proof of any violence between the [biological parents] in the ensuing two-plus years is a recording of an angry shouting match in December 2012." Therefore, the court did not find clear and convincing evidence that the conditions that led to the court's removal in February 2012 still persist.

The court concluded that "the time has come to end the struggle over Makenzie's custody" and ordered "an immediate change of custody from the Meltons to her parents." The court appointed a special master to assist with the transition and to "ensure that Makenzie's best interests will be kept in the court's purview."

On May 21, 2014, the parents filed a motion for attorney's fees pursuant to Tenn. Code Ann. § 36-5-103(c), requesting $40,688.75 in fees and expenses. The parents also

15

filed a motion for discretionary costs, pursuant to Tenn. R. Civ. P. 54.04. By order entered September 25, 2014, the trial court held that Tenn. Code Ann. § 36-5-103(c) does not authorize the award of attorney's fees in this case. The court ruled that the parents were entitled to $2,000 in discretionary costs pursuant to Tenn. R. Civ. P. 54.04.

The Meltons appeal, asserting the trial court erred in declining to terminate Mother's and Father's parental rights. They assert there is clear and convincing evidence to support of a finding of the grounds of persistence of conditions, severe abuse, and abandonment. They further argue that the court committed reversible error in excluding evidence of sibling abuse and in changing a custody order without conducting a best interest analysis. Lastly, the parents assert the trial court erred in denying their request for attorney's fees.

ANALYSIS

Parents have a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of their own children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The State may interfere with parental rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Appellate courts review the trial court's findings of fact in termination proceedings de novo on the record and accord these findings a presumption of

16

correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. "In light of the heightened burden of proof in [termination] proceedings . . ., the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. Proof of only one statutory ground is necessary to support a court's termination of a parent's rights. *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013); *In re Valentine*, 79 S.W.3d at 546. If a ground for termination is established by clear and convincing evidence, the trial court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)).

### A. Grounds for Termination: Persistence of Conditions

The Meltons assert that the record contains a preponderance of clear and convincing evidence that the grounds of persistence of conditions exists. Although not raised as an issue by either party on appeal, we will consider, as a threshold matter, whether Tenn. Code Ann. § 36-1-113(g)(3), which is referred to as "persistence of conditions" can serve as a ground for terminating Mother and Father's parental rights to Makenzie. *See In re Audrey S.*, 182 S.W.3d at 871 (Tenn. Ct. App. 2005). Under Tenn. Code Ann. § 36-1-113(g)(3), parental rights may be terminated where:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or a guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In *In re Audrey S.*, 182 S.W.3d at 874, this Court opined that "Tenn. Code Ann. § 36-1-113(g)(3) applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *See also In re Alysia S.*, No. M2013-02596-COA-R3-

17

PT, 2014 WL 7204406, at *28 (Tenn. Ct. App. Dec. 17, 2014). The prior order at issue in this case is the February 1, 2012 order naming the Meltons as Makenzie's primary residential parents. There is nothing in that order adjudicating Makenzie dependent or neglected.[6] Moreover, with respect to abuse, the order specifically states, "[t]he Court has serious concerns that there were bruises on the children, especially Ashton L[.], but there was no proof that the parents have abused the children." The February 2012 order does not contain judicial findings of dependency, neglect, or abuse. Therefore, Tenn. Code Ann. § 36-1-113(g)(3) may not be considered as a potential ground for termination of the parents' rights to Makenzie. Our holding in this regard pretermits our consideration of the Meltons' arguments regarding the evidence of persistence of conditions.

B.      Grounds for Termination: Severe Abuse

A court may terminate parental rights when it finds, by clear and convincing evidence, that:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such

---

[6] At the hearing on March 4, 2013, counsel for the Meltons clarified that the February 1, 2012 order did not adjudicate Makenzie dependent and neglected in the following colloquy with the court:

> THE COURT: -- as part of these preliminary matters, I think, are we concerned with anything in this case that goes back beyond the judge in Sumner County's order, which I think was February of 2012?
> MR. PARSLEY: Judge, I believe by way of history that that may be helpful to The Court, because --
> THE COURT: I mean, he found that she was dependent and neglected.
> MR. PARSLEY: I'm sorry?
> THE COURT: She -- He found that she was dependent and neglected.
> MR. PARSLEY: No, Your Honor –
> THE COURT: Well –
> MR. PARSLEY: -- I don't believe Judge Brown did.
> THE COURT: Okay.
> MR. PARSLEY: And that's part of why we need this history if -- from a review of Judge Brown's order, he had some serious concerns as relates to the parents. But he did not go and say "I find them dependent and neglected."
> THE COURT: So -- But he left them in the custody of the Melton -- left her in the custody of the Meltons.
> MR. PARSLEY: That is correct, Your Honor.

child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in pertinent part, by Tenn. Code Ann. § 37-1-102(b)(21)(A)(i) as:

The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]

   i.  Notice

As an initial matter, the parents' contend that the Meltons' petition did not allege severe abuse as a ground for termination. The parents assert that the Meltons' failure to specifically plead allegations of severe abuse did not provide them adequate notice of the grounds for termination sought against them.

With respect to abuse, the April 11, 2013 petition to terminate parental rights alleged, in relevant part, the following:

21. Upon investigation by the Department of Children's Services and subsequent Emergency Petitions, Magistrate Carlton Lewis of the Davidson County Juvenile Court has terminated all of the respondents' visitation with the child's sibling Ashton L[.] finding it was not in the minor child's best interest to have any contact with the respondents.

22. The minor child was present and a witness to the physical and mental abuse of her sibling Ashton L[.]

23. In addition to Ashton L[.]'s abuse, this minor child has been a victim of the respondents' mental and physical abuse.

24. Attached to this petition as a collective exhibit are letters from the child's pediatrician and therapist stating that they do not recommend that the children be returned to the parents.
. . .
26. For all the foregoing reasons, Petitioners aver that it is in the best interest of the child pursuant to T.C.A. 36-1-113 and the public that any and all parental rights that Adam and Ashley E[.] may hold to Makenzie L[.], be forever terminated and that the complete custody, control and guardianship of said child be awarded to the petitioners.

When handling preliminary matters prior to the beginning of trial, the trial court stated:

> [A]lthough it's not pled very specifically, the court does find that the ground in the petition is severe child abuse. . . . [I]t seems to me that that's what we are here on is abandonment and persistence of conditions and severe child abuse, all of which occurred after Judge Brown's initial order.

This Court has previously discussed the importance of strictly adhering to procedural requirements in termination of parental rights cases. *See In re Johnny K. F.*, No. E2012-02700-COA-R3-PT, 2013 WL 4679269, at *7 (Tenn. Ct. App. Aug. 27, 2013); *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037, at *6 (Tenn. Ct. App. June 3, 2008). "Providing notice of the issues to be tried is considered a fundamental component of due process." *In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *4 (Tenn. Ct. App. Jan. 11, 2012) (citing *In re W.B. IV.*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *13 (Tenn. Ct. App. Apr. 29, 2005)). Therefore, "[a] trial court cannot terminate parental rights based on a ground that is not alleged in the complaint." *In re Tristyn K.*, No. E2010-00109-COA-R3-PT, 2010 WL 2867179, at *5 (Tenn. Ct. App. July 22, 2010).

Although the petition is not a model of clarity with regard to the ground of severe abuse, we have reviewed the record and agree with the trial court that the ground of severe abuse, as defined by Tenn. Code Ann. § 36-1-113(g)(4), was pled in the Meltons' April 2013 petition to terminate parental rights. Moreover, the trial court went to great lengths to clarify the grounds for termination prior to the beginning of the trial, and there was no doubt that one of the grounds the Meltons were pursuing was a theory of severe abuse. Therefore, we find that the parents had adequate notice regarding the grounds of severe abuse.

### ii. Evidence of sibling abuse

Next, we consider the Meltons' assertion that the trial court erred in failing to allow evidence of the parents' alleged abuse of Ashton, Makenzie's younger brother, to support the termination of their rights to Makenzie.

The trial court ruled on several occasions throughout the trial that "the abuse of Ashton is not relevant to this proceeding." For example, during the testimony of Dr. Dundon, Makenzie's and Ashton's treating pediatrician, the court disallowed evidence of Dr. Dundon's observation of Ashton at a physical exam. The court also sustained an objection to the introduction of a photograph of Ashton's injurires. Next, Ms. Melton attempted to discuss injuries to Ashton, and following an objection by the parents' counsel, she was directed not to testify regarding his injuries. Again, during the testimony of Patricia Sparks, the court sustained an objection to Ms. Sparks's testimony regarding Ashton's injuries.

We disagree with the trial court's position that the abuse of Ashton is "not relevant" to the proceeding involving Makenzie. Tennessee Code Annotated section 36-1-113(g)(4) states that parental rights may be terminated based on a finding by clear and convincing evidence that the parent has "committed severe child abuse against the child who is the subject of the petition *or against any sibling or half-sibling of such child*, or any other child residing temporarily or permanently in the home of such parent or guardian[.]" (Emphasis added). Therefore, evidence regarding the injuries Ashton allegedly sustained at the hands of his parents is properly considered in an analysis of whether Mother's and Father's parental rights as to Makenzie should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4). *See In re Eric J.P.*, No. M2012-02082-COA-R3-PT, 2013 WL 1788547, at *3-4 (Tenn. Ct. App. Apr. 24, 2013) (finding grounds of severe abuse existed where the parents were found to have committed severe abuse of a sibling or half-sibling). The trial court cited Tenn. Code Ann. § 36-1-113(g)(4) in a footnote and stated, "any evidence heard by the Court regarding Ashton was not sufficient to find that he was subjected to severe abuse as defined in § 102, nor is there any order in the record making such a finding." However, the trial court refused to hear much of the evidence that was proffered regarding the abuse of Ashton; thus, the trial court did not get the full picture of the extent of abuse, if any, that transpired with respect to Makenzie's sibling.[7]

It was error for the trial court to refuse to allow witnesses to testify regarding abuse Ashton allegedly endured because such evidence was relevant to the question of whether the parents' rights to Makenzie could be terminated under Tenn. Code Ann. § 36-1-113(g)(4). Therefore, we must remand the case for a determination of whether the ground of severe abuse, as defined by Tenn. Code Ann. § 36-1-113(g)(4), applies in this case.

### C.     Grounds for Termination:  Abandonment

A parent's rights may be terminated upon proof by clear and convincing evidence that the parent "abandoned" the child. Tenn. Code Ann. §§ 36-1-113(c)(1), (g)(1). "Abandonment," for purposes of terminating a parent's rights, is defined to include the following:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents. . . , that the parent or parents. . . either have willfully

---

[7] The parents have appended to their brief, an order allegedly signed by the trial court on July 1, 2014, which disposes of a dependency and neglect petition filed by DCS regarding Ashton. This order is not part of the official technical record on appeal; therefore, we cannot consider it. *See State v. Smotherman*, 201 S.W.3d 657, 660 (Tenn. 2006) ("The appellate record provides the boundaries of an appellate court's review. . . . An appellate court may consider only evidence contained in the appellate record.").

failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). Willfulness is a critical element of the definition of abandonment. Willful, in this context, means that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Audrey S.*, 182 S.W.3d at 864); *see In re Audrey S.*, 182 S.W.3d at 863-64 (an individual acts willfully if he or she knows what he is doing and has the intention to do what he or she is doing). The "[w]illfulness of a parent's conduct depends on the parent's intent, and intent is seldom capable of direct proof." *In re Alysia S.*, 2014 WL 7204406, at *22 (citing *In re Audrey S.*, 182 S.W.3d at 864). Thus, the trier-of-fact must infer intent from circumstantial evidence, such as the parents' conduct. *Id.* "Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness." *Id.*

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). A court will not find a parent has abandoned his or her child if his or her failure to support or to visit the child is outside his or her control. *Id.*

The trial court ruled that the parents' failure to visit or support Makenzie within the four-month period preceding the filing of the petition was not willful. The petition at issue was filed on April 11, 2013; thus, the relevant time period is December 10, 2012 to April 10, 2013. It is undisputed that neither Mother nor Father visited or financially supported Makenzie during this time.

i. Willful failure to visit

In support of its determination that the parents' failure to visit Makenzie was not willful, the trial court noted that the Meltons did not comply with the juvenile court's order to reunite the family because "they were told by DCS that the order restricting visits with the [parents'] son applied to Makenzie." The court also cited *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007), to support its holding.

In *In re Adoption of A.M.H.*, this Court was presented with a situation where the parents of A.M.H. "actively pursued legal proceedings to regain custody of A.M.H. during the 'abandonment' period but failed to visit for a period of four consecutive months immediately prior to the filing of the petition for termination of parental rights." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. The Court held that where "the parents' visits with their child have resulted in enmity between the parties and where the parents

22

redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment." *Id.*

In this case, the parents and the Meltons testified that a DCS caseworker notified them in August 2012 that visitation between Makenzie and the parents should cease. On February 11, 2013, the Meltons filed a Petition to Terminate Parental Rights and for Adoption of Minor Children in the Robertson County Chancery Court. On March 14, 2013, the parents filed an Answer and Counterclaim for Paternity and Custody in which they asserted they were "entitled to immediate custody" of Makenzie. The Meltons voluntarily dismissed the petition in Robertson County and filed a petition for termination of parental rights on April 11, 2013, in Davidson County Juvenile Court. On April 12, 2013, Mother and Father filed a Motion to Enforce Visitation Order, seeking to recommence visitation with Makenzie.

While the parents' efforts to reconnect with Makenzie were not as extensive as those of the parents in *In re A.M.H.*, the record does show that Mother and Father turned to the court in an effort to maintain a parent-child relationship with Makenzie by filing a counter-petition for custody in March 2013. *Cf. id.* at 810-11. Moreover, like the parties in *In re Adoption of A.M.H.*, testimony in this case was replete with examples of "enmity" between the parents and the Meltons, and on March 12, 2013, the parents' attorney sent a letter to the Meltons attempting to reinstate visitation with Makenzie in accordance with the February 2012 order. Thus, the parents were seeking to enforce the February 2012 order during the last month of the relevant four-month time period. In addition, and most importantly, both parties testified that they were asked by DCS to discontinue visitation in August 2012. In light of DCS's request that the parties discontinue visitation, the hostility between the parties, and the fact that Mother and Father re-directed their efforts at maintaining a parent-child relationship to the Robertson County Chancery Court by filing a counter-petition for custody within the four months preceding the filing of the petition to terminate, we uphold the trial court's determination that the parents' failure to visit was not willful.

ii. Willful failure to support

In determining that the parents' failure to support Makenzie was not willful, the trial court stated:

> The failure to pay anything toward support is another matter. The E[.]s' excuses (not being ordered to pay support and their extraordinary legal expenses) do not merit much consideration from this Court. "In Tennessee, biological parents are expected under the common law to understand, even in the absence of a court order, that they have an obligation under the law to support their children if they have the ability to do so." *Smith v. Gore*, 728 S.W.2d 738 (Tenn. Ct. App. 1987). However, when parents do not have

23

custody of their children, the nature and extent of their duty may be defined and controlled by external factors other than ability to support. "In these circumstances, the nature and extent of the duty to support may be based on a court order defining the support obligation." *In re MJ.B.*, 140 S.W.3d 643, at 655 (Tenn. Ct. App. 2004). The Court finds that because the E[.]s were visiting with Makenzie prior to July 31, 2012 under a plan to restore custody to them and thereafter were actively seeking custody, they were seeking to support her. The record also shows that the E[.]s were following the process of the Child Support Division of the District Attorney in establishing any support that may have been due. There is no evidence that they were not cooperating in that process. So under all the circumstances of this case, the Court concludes that the failure to pay support was not willful, either.

There is no dispute that the parents failed to pay any support for Makenzie during the relevant four-month time period. While there was not extensive testimony regarding the parents' household expenses, Father testified that he earned "over $100,000" per year working for a car dealership and is capable of financially supporting Makenzie. Mother also testified that she and Father paid approximately $70,000 in legal expenses to "get Makenzie back."

The trial court correctly noted that parents are presumed to know they have a legal obligation to support their children. *See* Tenn. Code Ann. § 36-1-102(1)(H). Moreover, there is a well-settled rule in Tennessee that:

> biological parents must, as a general matter, support their children until they reach the age of majority. . . . The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married.

*State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL 2002577, at *2 (Tenn. Ct. App. July 6, 2006) (citing Tenn. Code Ann. § 34-1-102(a); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn. 1987)); *see also State Dep't of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997) ("We dare say that the support of one's children should not be conditioned upon whether one has been placed under a court order to do so."). However, we must consider the entire "constellation of facts" when making a determination of whether a parent's failure to financially support their child was willful. *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013).

In this case, the court primarily relied on *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004), to support its conclusion that the parents' failure to pay support was not willful. The mother in *In re M.J.B.* brought her children to a community service agency

and requested that the children be placed in the custody of DCS because they were "malnourished and essentially naked." *In re M.J.B.*, 140 S.W.3d at 646. Eventually, DCS filed a petition to terminate the mother's rights to her children on the ground of, *inter alia*, abandonment by willful failure to support. *Id.* at 649. The trial court terminated the mother's rights on that basis, but this Court reversed the trial court, finding that her failure to support was not willful. *Id.* at 655. This Court stated:

> All parents have a duty to support their children. However, when parents no longer have custody of their children, the nature and extent of their duty may be defined and controlled by external factors other than the parents' ability to support. In these circumstances, the nature and extent of the duty to support may be based on a court order defining the support obligation. When a child has been placed in the Department's custody in a dependent-neglect proceeding, a parent's support obligation may also be defined by the permanency plan for the child.

*Id.* (footnote omitted). The Court went on to state that there was no indication that the mother was "aware that she was still obligated to support her children financially after they were placed in the Department's custody." *Id.* In addition, the Court held that mother had insufficient income to support herself or her children because she had to rely on others for financial support. *Id.* The Court ruled that DCS failed to carry its burden to prove that the mother willfully failed to support her children. *Id.*

The present case is distinguishable from *In re M.J.B.* in two primary respects. First, the child in this case was not in the custody of the State; rather, Makenzie's paternal great aunt and uncle were her primary residential parents. The court in *In re M.J.B.* emphasized that the mother was not aware that she was obligated to support her children financially after they were placed in DCS custody. *See* Tenn. Code Ann. § 37-2-403(a)(2) (requiring DCS to provide a "statement of responsibility" to the parent of a child in foster care giving specific notice of the definition of abandonment and that the willful failure to support or to visit for four months can be used to terminate the parent's rights). Tennessee Code Annotated section 37-2-403(a)(2) is not applicable where the child is placed with a family member. *In re Alysia*, 2014 WL 7204406, at *3 n.2; *but cf. In re K.C., Jr.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *11 (Tenn. Ct. App. Oct. 4, 2005) (considering the fact that a mother did not have notice that her rights could be terminated for her failure to support her child who was in the custody of her aunt (not DCS) as a factor in concluding that her rights should not be terminated on that basis). Second, unlike the mother in *In re M.J.B.*, the evidence showed that the parents in this case were financially capable of supporting Makenzie. In *In re M.J.B.*, the mother "had no marketable skills," she had jobs that did not provide sufficient income to support herself, and she had attempted to meet her financial obligations by selling plasma twice a week. *In re M.J.B.*, 140 S.W.3d at 655. Here, Father testified that he made at least

25

$100,000 per year as a salesman and had a nice home in which he and Mother could raise their children. The trial court's reliance on *In re M.J.B.* was misplaced.

The trial court elaborated on its reasoning for determining the parents' failure to support was not willful by stating, "because the E[.]s were visiting with Makenzie prior to July 31, 2012 under a plan to restore custody to them and thereafter were actively seeking custody, they were seeking to support her." We have found no statutory authority or caselaw to support the trial court's conclusion based on these facts. Parents who are "actively seeking custody" through the judicial process are not providing support for their children as contemplated by Tenn. Code Ann. § 36-1-102(1)(A)(i). In their brief, parents request this Court to "make an affirmative finding that when parents are compelled to redirect their finances to seek legal representation to protect their right to parent their child, the abandonment by failure to pay financial support is not grounds for termination." We reject the parents' invitation to so hold.

Finally, the trial court stated, "The record also shows that the E[.]s were following the process of the Child Support Division of the District Attorney in establishing any support that may have been due. There is no evidence that they were not cooperating in that process." We have reviewed the record and find that the extent to which the parents were cooperating with the Child Support Division in setting child support is unclear. For example, the record shows that the Meltons served a summons with a "Petition to Set Support" on Mother in June 2012. Regarding this petition, Mother testified as follows:

> Q. Ms. E., do you recall being served with a petition to set child support?
> A. When?
> Q. Back in June of 2012.
> A. I think so, yes.
> . . .
> Q. And you just - - you just testified that you were served with a child support document in June of 2012?
> A. Yes.
> Q. Did you ever go to child support court?
> A. I gave it to my attorney, and he said "I'll take care of it," and I never heard anything else about it.
> Q. Okay. Never - - never tried to figure out down the road what had happened to that?
> A. I had asked David and he said "don't worry about it."

When Mother was questioned about whether she felt she had an obligation to pay child support or provide clothing or food for Makenzie, Mother answered as follows:

> A. I have not been ordered to pay child support.

26

Q. I understand that. But you don't think that you have any obligation to pay for any of those things for your daughter?

A. They've never asked.

Q. That's not my question, ma'am. I'm saying you, personally, regardless of where she's staying or who has custody, you don't think you have any obligation to pay for your child?

A. Uhm…

Q. I take that as a "no"?

A. You know, there's just so many different ways to look at that. That's my answer.

As we have previously stated, the law is clear that parents have a duty to support their children even absent a court order requiring them to do so. *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004). Thus, even if the parents "were following the process of the Child Support Division of the District Attorney in establishing any support that may have been due," as the trial court stated, this fact alone does not justify a determination that their failure to support was not willful, nor does it absolve them from the responsibility to support their child financially while the matter was pending a final resolution.

"As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment [is] reviewed de novo with no presumption of correctness." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640. It is undisputed that the parents failed to support Makenzie during the four months preceding the filing of the petition. In addition to failing to provide monetary support for Makenzie, the parents failed to provide any other type of support for the child. Although the statute requires us to confine our examination to the four months prior to the filing of the petition to terminate, when we consider the "entire constellation of facts," we note that the parents never paid the Meltons any form of support (other than one instance approximately four years prior to the hearing in this case) from the time Makenzie came into their care in 2008 until the final hearing in this matter in 2014. The evidence shows that the parents had the capacity to pay for the support of Makenzie during the relevant time period—Father made over $100,000 per year in 2012 and 2013. Finally, we do not find the absence of a child support order or the parents' minimal cooperation with the Child Support Division of the District Attorney to be a justifiable excuse for their not providing support to Makenzie. Therefore, we hold that the evidence in this case clearly and convincingly supports a finding that the parents willfully abandoned Makenzie within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(i) by willfully failing to support or make reasonable payments toward the

support of Makenzie. Accordingly, we reverse the trial court's finding that this ground for termination was not proven by clear and convincing evidence.

### D. Best Interest

In order to terminate parental rights, "a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "[I]t cannot be presumed that the existence of grounds necessarily leads to the conclusion that termination is warranted." *In re M.L.P.*, No. W2007-01278-COA-R3-PT, 2008 WL 933086, at *12 (Tenn. Ct. App. Apr. 8, 2008); *see e.g., In re C.E.P.*, No. E2003-02410-COA-R3-PT, 2004 WL 2191040, at *6 (Tenn. Ct. App. Sept. 29, 2004) (finding termination was not in the child's best interest even though grounds for termination existed).

Here, the trial court never reached the issue of whether termination of the parents' rights would be in Makenzie's best interest because the court found that grounds for termination did not exist. Because we reverse the court's conclusion that the parents did not willfully abandon Makenzie by failing to support her, we must remand the case to the trial court for a determination, pursuant to Tenn. Code Ann. § 36-1-113(i), of whether termination of the parents' rights is in the best interest of the child. *See In re M.L.P.*, 2008 WL 933086, at *13 (finding grounds for termination and remanding the case to the trial court for a best interest determination).

### E. Attorney's Fees

Finally, we consider the parents' argument that the juvenile court erred in denying their request for attorney's fees. The determination of the appropriate amount of attorney's fees to award, if any, is a matter generally left to the discretion of the trial court. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (citing *Kline v. Eyrich*, 69 S.W.3d 197, 203 (Tenn. 2002). However, in cases where the legal justification of the award is at issue, this Court reviews the decision of the trial court de novo with no presumption of correctness. *Bryant v. Bryant*, No. 01A01-9806-CV-00337, 1999 WL 43282, at *6 (Tenn. Ct. App. Feb. 1, 1999) (citing *State Dep't of Human Servs. v. Shepherd*, No. 89-78-II, 1989 WL 144019, at *1 (Tenn. Ct. App. Nov. 29, 1989)).

"[I]n the absence of a statute, contract, or other compelling equitable ground, a trial court cannot compel a losing party to pay a prevailing party's legal expenses. *Bryant*, 1999 WL 43282, at *6 (citing *State ex rel. Orr v. Thomas*, 585 S.W.2d 606, 607 (Tenn. 1979)). In this case, the parents requested fees pursuant to Tenn. Code Ann. § 36-5-103(c), which states:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

The trial court held that Tenn. Code Ann. § 36-5-103(c) was inapplicable to this termination of parental rights proceeding and denied the motion for attorney's fees.

The court cited *Bryant v. Bryant* in support of its holding. In *Bryant*, this Court determined that Tenn. Code Ann. § 36-5-103(c) does not apply in termination of parental rights proceedings. *Bryant*, 1999 WL 43282, at *6; *see also In re Nathaniel C.T.*, 447 S.W.3d 244, 247-48 (Tenn. Ct. App. 2014). The Meltons initiated this case by filing a petition for termination of parental rights. Therefore, we find that Tenn. Code Ann. § 36-5-103(c) does not provide a statutory basis for the award of attorney's fees in this termination proceeding.[8] We, therefore, affirm the trial court's order denying an award of attorney's fees to the parents.

CONCLUSION

The trial court's order is affirmed in part and reversed in part. Because this Court has found one ground for termination exists and that evidence relating to another ground was improperly excluded, the case must be remanded to the trial court for a hearing on whether the ground of abuse as defined by Tenn. Code Ann. § 36-1-113(g)(4), applies in this case and whether the termination of Mother's and Father's parental rights is in the best interest of Makenzie.

The unusual twist in this case is that the trial court returned Makenzie to the custody of her parents when it found that there were no grounds for termination. We have reversed that finding and remand for further hearing. The Meltons argue that the trial court erred in returning the child to her parents, and the parents argue that the trial court's earlier order of February 1, 2012 giving the child to the Meltons was invalid. After much consideration, we decline to address this issue at this time because no analysis of the best interest of the child has been conducted. If the trial court determines that it is not in the child's best interest to terminate her parents' rights, then the trial court is to hold a new hearing on the custody of the child. If the trial court determines that it is in the child's best interest to terminate her parents' rights, then the trial court shall

---

[8] We find the parents' equal protection arguments unavailing.

determine where to place the child. In either event, the trial court will make a new determination regarding the custody of Makenzie in light of her best interest, and the Feb. 1, 2012 custody order as well as the May 7, 2014 custody order will be superseded.

Costs of the appeal are assessed equally between the parties.

_____
ANDY D. BENNETT, JUDGE